DAOUD v DE LEAU

Docket Nos. 103247, 103248. Argued March 5, 1997 (Calendar No. 8).
   Decided July 15, 1997.
   Ghassan Daoud brought an action in the Kent Circuit Court against
      Carmel (Karachy) De Leau, Lisa Vande Waa, and Bethany Christian
      Services, alleging that the principal defendants perjured themselves
      in an earlier probate court case, causing him to lose the parental
      rights to his child. The court, Robert A. Benson, J., granted the
      defendants' motions for summary disposition, finding the claims
      barred by the doctrines of absolute witness immunity and res judi-
      cata. The Court of Appeals, NEFF, P.J., and SAWYER and HOEKSTRA,
      JJ., affirmed in an unpublished memorandum opinion (Docket Nos.
      171562, 176339). The plaintiff appeals, limited to whether the wit-
      ness immunity doctrine bars his suit for damages.
   In a unanimous opinion per curiam, the Supreme Court *held*:
   The plaintiff has failed to state a claim on which relief can be
   granted.
   1. The court rules are a primary source for determining the
   means by which a person aggrieved by fraud or perjury used to
   obtain a judgment may seek a remedy. Where statutes and court
   rules provide effective means for dealing with a judgment fraudu-
   lently obtained through perjury, it is neither sound law nor sound
   policy to permit a separate cause of action for fraud. In this case,
   the court rules permitted the plaintiff access to the probate court
   for the purpose of righting the perceived wrong, and the plaintiff
   did exercise the opportunity to return to that court and presented
   fully the circumstances underlying the present complaint. In addi-
   tion, he also had the option of seeking appropriate relief in circuit
   court in a related divorce action.
   2. Witness immunity is grounded in the need of the judicial sys-
   tem for testimony from witnesses who are free of concern that
   they will be targeted by the loser for further litigation. Absent per-
   jury of a character requiring action by the prosecuting attorney, the
   testimony of a witness is to be weighed by the factfinder in the
   matter at bar, not by a subsequent jury summoned to determine
   whether the first lawsuit was tainted by fraud. A second suit for
   fraud, based on perjury, may not be filed against a person involved

in a first suit if the statutes and court rules provide an avenue for bringing the fraud to the attention of the first court and asking for relief there. Under the court rules, the plaintiff was able to seek a remedy for the alleged perjury in the probate court, and he also could have asked the judge in the circuit court divorce action to issue an order regarding the alleged misrepresentation concerning visitation. Taking as true the facts alleged by the plaintiff in this case, he has failed to state a claim on which relief can be granted.

Affirmed.

*Bremer, Wade, Nelson, Lohr & Corey* (by *Michael D. Wade*) for the plaintiff-appellant.

*Timothy A. Hoesch* for defendant-appellee De Leau.

*Varnum, Riddering, Schmidt & Howlett* (by *Stephen Afendoulis, Perrin Rynders,* and *Jon M. Bylsma*) for defendants-appellees Bethany Christian Services, Inc., and Lisa Vande Waa.

PER CURIAM. In a circuit court complaint, the plaintiff alleged that the principal defendants perjured themselves in an earlier probate court case, causing him to lose the parental rights to his child. The circuit court granted summary disposition for the defendants, and the Court of Appeals affirmed. We likewise affirm. On these facts, the plaintiff has failed to state a claim on which relief can be granted.

I

In August 1989, Carmel M. De Leau[1] became pregnant with the child of Ghassan H. Daoud.[2] They mar-

---

[1] At that time, her surname was Karachy. Upon marriage, she took Mr. Daoud's last name. When later divorced, she went back to Karachy. Her current surname is De Leau. In this opinion, we will call her Ms. De Leau.

[2] This case has not been tried, and thus we accept as true the factual allegations of plaintiff Ghassan Daoud. Much of the procedural history

ried in Michigan, the ceremony taking place in September 1989.

At the time of these events, Mr. Daoud was not an American citizen,[3] and his status with the Immigration and Naturalization Service was an issue at several junctures. He says he entered the country "on a five year multiple entry visa issued by United States Immigration, valid from 4/13/88 through 4/12/93, allowing him multiple entries into the United States for six months periods [sic] at a time."

Shortly after their marriage, the parties encountered significant marital difficulty.[4] Mr. Daoud filed a January 1990 complaint for divorce.

Ms. De Leau decided to explore the possibility of placing the parties' unborn child for adoption at the time of birth, which was expected to occur in April 1990. To this end, she obtained the assistance of Bethany Christian Services in Holland. It is unclear whether, at that stage, Ms. De Leau disclosed that she was married.

In January 1990, Lisa Vande Waa of Bethany Christian Services wrote to Mr. Daoud explaining that she was "working with Carmel Karachy" who "is planning to release the baby for adoption and has named you as the father of her expected child." Ms. Vande Waa's

---

can be confirmed from court files in the ancillary litigation that is described in this opinion.

[3] The record is inconsistent with regard to whether Mr. Daoud's residence is in Israeli, Jordanian, or Palestinian territory.

[4] Both Mr. Daoud and Ms. De Leau have indicated that her family refused to accept the marriage and the expected child because of religious differences. Further, Ms. De Leau's paternal grandmother, an uncle, and some cousins live in the same part of the Mideast as Mr. Daoud's family, and they told her that Mr. Daoud was already married, with several children.

letter advised Mr. Daoud that his options included release of his parental rights, or a probate court petition for custody.

The attorney who was representing Mr. Daoud in the Kent Circuit Court divorce action (Kenneth C. Hoogeboom) wrote back to Ms. Vande Waa several days later. He explained that Ms. De Leau remained married to his client, and that divorce proceedings were currently within the jurisdiction of the Kent Circuit Court. The letter included the Kent Circuit Court docket number, the date of the complaint, and a request that Mr. Hoogeboom be contacted if, for any reason, Ms. Vande Waa failed to close her adoption file.

Mr. Daoud earlier had applied for a permanent immigration visa and "green card." Ms. De Leau was his sponsor, but she revoked her sponsorship when the marriage failed. In the wake of this development, Mr. Daoud left the United States in February 1990.[5]

Mr. Daoud says that, before departing, he left clothes and toys for the child. Foreseeing that Ms. De Leau might not want to keep the child, Mr. Daoud also made arrangements with close friends, Kader and Michelle Karaein, who agreed in a letter to Mr. Hoogeboom to care for the child until Mr. Daoud could take custody.

In March 1990, Ms. Vande Waa sent Mr. Daoud a letter that was virtually identical to her January letter. Again, she explained that Ms. De Leau "is planning to release the baby for adoption," and that Mr. Daoud's

---

[5] There is some indication that Mr. Daoud faced deportation if he did not voluntarily leave the country for a time.

choices included a release of his parental rights or a probate court petition for custody.

Shortly before Ms. Vande Waa sent her second letter, Mr. Hoogeboom filed a motion in Kent Circuit Court, asking for an order prohibiting Ms. De Leau from going forward with the adoption.[6] Late in March of 1990, Ms. De Leau's divorce attorney (William D. Evenson) wrote to Mr. Hoogeboom, to say that Ms. De Leau would not be placing the child for adoption and, thus, there was no need for a circuit court hearing on the motion.

The child, David Daoud, was born April 21, 1990. However, Ms. De Leau never brought him home from the hospital. Unbeknownst to Mr. Daoud, she instead surrendered the baby on April 23 to Bethany Christian Services, which placed him in foster care, in anticipation of adoption.[7]

Because Mr. Evenson had assured him that the child would not be placed for adoption, Mr. Hoogeboom did not pursue his motion. Instead, the parties agreed to the entry of an April 27, 1990 Kent Circuit Court order, stating that Mr. Daoud would have reasonable visitation with the child.

---

[6] On learning of Ms. Vande Waa's second letter, Mr. Hoogeboom again telephoned Ms. Vande Waa. He also spoke with Glenn DeMots, described as a director at Bethany Christian Services. He repeated that Mr. Daoud would not consent to adoption and that the attempt to arrange an adoption was improper. The plaintiff further alleges that, "subsequently, Kenneth Hoogeboom and Glenn DeMots had a heated conversation at church regarding the matter wherein Mr. DeMots assured Kenneth Hoogeboom there would be no future problems with this matter."

[7] Bethany Christian Services and Ms. Vande Waa deny "because it is untrue" that Bethany took the child from the hospital on April 23 and placed him in foster care. However, Bethany also states that Ms. De Leau "requested that her child be released to Bethany Christian Services for interim foster care."

Mr. Daoud says that he learned of the child's birth around May 1, and that from May through August 1990, while out of the country, he made "numerous" telephone calls to Ms. De Leau inquiring about the baby and when he could visit him. He further says that, although Ms. De Leau never took the baby home from the hospital, "she represented that she had custody of the child and assured Ghassan Daoud during these phone conversations that 'the baby is fine,' he 'looks just like you,' 'he has curly hair.' " Ms. De Leau denies that such conversations occurred, but it appears that Mr. Daoud was allowed to continue in his belief that the child remained in the custody of Ms. De Leau.

Likewise believing that Ms. De Leau retained custody, Messrs. Hoogeboom and Evenson continued negotiating toward a settlement of the divorce case.

In September 1990, Mr. Daoud returned to the United States and settled in California. He says that Ms. De Leau knew of his return, and knew where he lived. She denies that. Evidently, Mr. Daoud remained in California throughout the period when the remaining events described in this opinion occurred.

Mr. Daoud alleges that, during this period, he continued to place telephone calls to Ms. De Leau, inquiring about David's well-being and requesting visitation. He says that she "repeatedly promised" visitation, but that "whenever the agreed upon visitation periods drew near, Carmel (Karachy) De Leau would have some excuse as to why Ghassan Daoud could not visit the child." Again, Ms. De Leau denies these conversations.

The eventual result of the attorneys' negotiations was an October 4, 1990 judgment of divorce, which

granted "sole legal care, custody, education and control" of David Daoud to Ms. De Leau. Mr. Daoud was given thirty days of visitation a year, at times and places on which the parties would later agree. Mr. Daoud was ordered to pay ten dollars a week in child support. The judgment of divorce recited that Mr. Daoud's address was a postal box in Amman, Jordan.[8] The judgment also included this language under the heading "ATTORNEY OF RECORD":

> [Ms. De Leau] shall not schedule any court hearing, or any proceeding affecting the relationship of [Mr. Daoud] and said child without giving present counsel, Kenneth C. Hoogeboom or his successor, the appropriate notice in writing.

Finally, the divorce judgment required Ms. De Leau to notify the Friend of the Court and Mr. Daoud "whenever the child is moved to another address."

Almost immediately, Ms. De Leau resumed with her effort to have David formally placed for adoption.[9] On October 22, 1990 (eighteen days after the judgment of divorce), a protective services worker filed an Ottawa Probate Court petition. Mr. Daoud and Ms. De Leau agree that the petition was "pro-

---

[8] Mr. Daoud explains that he checks the Amman postal box every several months, and that it is a more reliable source of mail than his West Bank home where, he says, delivery can sometimes take as long as a year. Ms. De Leau, who has family in the area, has testified that Mr. Daoud can be found in both locales, and that communication services in Amman are quite dependable.

[9] Mr. Daoud sees these efforts as remarkable in their audacity, given the terms of the divorce judgment and his repeatedly expressed opposition to an adoption. Ms. De Leau's thought, in light of Mr. Daoud's absence and her family's opposition, seems to have been narrowly focused on the benefits that she believed David could gain from adoption.

cured" by Ms. De Leau, Ms. Vande Waa, and Bethany Christian Services.

The Ottawa Probate Court petition recited that David had been "abandoned" by Mr. Daoud, that he had been deported to the West Bank, and that he was unlikely to be allowed to return to the United States. The petition noted that David was subject to the continuing jurisdiction of the Kent Circuit Court.

The day the petition was filed (October 22), a referee conducted a preliminary hearing. On the basis of the allegations in the petition and testimony of Ms. De Leau and Ms. Vande Waa, the referee continued the "voluntary placement" of the child with Bethany Christian Services. He also authorized the filing of the petition.

Mr. Daoud says Ms. De Leau knew he was in California and could be easily reached (personally, or through Mr. Hoogeboom or the Karaeins). Yet she told the Department of Social Services to send notice of the hearing to the postal box in Amman, Jordan, knowing that it could take several months for Mr. Daoud to receive actual notice. As indicated, Ms. De Leau denies knowing that he was in California.

The next day, October 23, 1990, the Ottawa Probate Court appointed Philip R. Sielski to represent Mr. Daoud in the termination/adoption matter.

Mr. Daoud says that, while the probate court proceedings were under way, he was paying child support and unsuccessfully attempting to persuade Ms. De Leau to allow visitation. He says she continued to mislead him into thinking David was with her. Again, she denies the allegation.

The Ottawa Probate Court heard the petition on November 29, 1990. With regard to what took place, Mr. Daoud alleges in his complaint:

> 60. That at this hearing, Carmel (Karachy) DeLeau falsely testified that Ghassan Daoud was in the West Bank of Israel, that he was deported, and that he could not come back freely to the United States.
>
> 61. That at this hearing Carmel (Karachy) DeLeau falsely testified that Ghassan Daoud had provided no support to the child.
>
> 62. That at this hearing Carmel (Karachy) DeLeau also falsely testified that Ghassan Daoud deserted his wife and other children in Israel to move to America.
>
> 63. That Lisa VandeWaa of Bethany Christian Services testified at the hearing that neither Bethany Christian Services nor Carmel (Karachy) DeLeau had received any support from Ghassan Daoud. Lisa VandeWaa also testified that Ghassan Daoud could not come back to America.

The November 29, 1990 probate court record does contain such testimony from Ms. De Leau (though whether the testimony was false remains much in dispute). Ms. Vande Waa's testimony was somewhat different. Each did testify that Mr. Daoud had expressed little or no interest in the child's well-being. His primary concern was said to have been an unrealistic plan that Ms. De Leau join him in his native land.

Ms. De Leau tendered a termination of her own parental rights at the November 29, 1990 hearing.

When the hearing resumed in December 1990,[10] the probate court found that the statutory grounds for

---

[10] At the first session, it was observed that notice had been sent to an incorrect postal box in Amman, Jordan. The hearing was then adjourned to allow notice of the hearing to be sent to a different box.

termination[11] of parental rights had been met. The court terminated the parental rights of Mr. Daoud and accepted Ms. De Leau's voluntary termination.

Mr. Daoud alleges that, following the termination, he continued to believe that Ms. De Leau had David. He says he still phoned her, inquiring about the child's welfare and requesting visitation. He alleges that, during this period, Ms. De Leau "continued to represent that she had custody of the child and continued to assure Ghassan Daoud that the child was fine. She also discussed visitation, however, whenever the time period for agreed upon visitation drew near, she would concoct an excuse why Ghassan Daoud could not come and visit the child." Ms. De Leau denies the deception.

According to Mr. Daoud, it was not until August 1991 that he first learned that his parental rights had been terminated by the Ottawa Probate Court. He says he became aware when his brother checked the Amman, Jordan, postal box and contacted him in California.

Mr. Daoud then contacted Mr. Sielski, who filed a December 1991 motion for rehearing of the decision terminating Ghassan Daoud's parental rights. Along with the motion, Mr. Daoud submitted documentation that he had paid $523 in child support in five payments spread through 1990 and 1991.

The motion for rehearing was heard in January 1992. Mr. Daoud and Mr. Hoogeboom testified about the described events. Ms. De Leau testified that she had no contact whatever with Mr. Daoud from May

---

[11] MCL 712A.19b(3)(a)(ii), 712A.19b(3)(g); MSA 27.3178(598.19b)(3)(a)(ii), 27.3178(598.19b)(3)(g).

1990 until November 1991. She further testified that she received no child support ("not a dime") from Mr. Daoud or from the Kent County Friend of the Court.

Several days later, Mr. Sielski filed a motion to reopen the proofs, so that he could demonstrate that the Kent County Friend of the Court *had* forwarded Mr. Daoud's child support payments to Ms. De Leau. The motion was denied.

In late January 1992, the Ottawa Probate Court denied the motion for rehearing. It said that Mr. Daoud had shown no fraud that would warrant setting aside the termination orders. Noting that Mr. Daoud had never seen David or taken any affirmative steps (beyond conversing with Ms. De Leau) to secure visitation, the court concluded that "the stability and permanence of the minor are important factors at this stage of his life, and that the reasons presented in support of setting aside this court's prior orders are not substantial enough to cause the court to essentially start over with these proceedings."

Mr. Sielski filed a claim of appeal, which the Court of Appeals dismissed as untimely.[12] Later, the Court denied rehearing.[13] Mr. Daoud states that Mr. Sielski did not inform him of the outcome of his appeal until long after the expiration of the time for filing an application for leave to appeal in this Court.

In a further attempt to gain appellate review, Mr. Daoud filed a complaint for superintending control in the Court of Appeals. However, the complaint was dismissed[14] and this Court denied leave to appeal.[15]

---

[12] Unpublished order, entered May 29, 1992 (Docket No. 149252).

[13] Unpublished order, entered September 4, 1992 (Docket No. 149252).

[14] Unpublished order, entered October 20, 1993 (Docket No. 165825).

[15] *Daoud v Ottawa Probate Judge*, 444 Mich 954 (1994).

II

Mr. Daoud filed the present suit in Kent Circuit Court in August 1993, alleging fraud and fraudulent concealment by Ms. De Leau, Ms. Vande Waa, and Bethany Christian Services.[16] He also alleged negligence and a denial of civil rights on the part of Ms. Vande Waa and Bethany Christian Services.

The following month, Ms. Vande Waa and Bethany Christian Services moved for summary disposition, saying that Mr. Daoud's claims "are barred by the doctrine of absolute witness immunity" and "are also barred by the doctrine of res judicata." MCR 2.116(C)(6)-(8).[17]

The motion was granted. The circuit court offered this summary of the two defendants' position:

> Basically, it is the claim of the defendants that the plaintiff's cause of action is eventually, wholly, based upon the false testimony given by Lisa Vande[] Waa in front of the Ottawa County Probate Court. Defendants argue that the fraud and concealment, the negligence, and the civil right[s] action have to, ultimately, be based upon the false testi-

---

[16] The complaint also alleged that Mr. Sielski had committed malpractice. An amended complaint added Mr. Sielski's law firm on a theory of vicarious liability. The claims against Mr. Sielski and his firm are not part of the present appeal.

[17] These paragraphs permit summary disposition in these circumstances:

(6) Another action has been initiated between the same parties involving the same claim.

(7) The claim is barred because of release, payment, prior judgment, immunity granted by law, statute of limitations, statute of frauds, an agreement to arbitrate, infancy or other disability of the moving party, or assignment or other disposition of the claim before commencement of the action.

(8) The opposing party has failed to state a claim on which relief can be granted.

mony in front of the Probate Court. Defendants then argue that witnesses have absolute immunity for perjured testimony, and therefore the entire claim of the plaintiff against Ms. Vande[] Waa and Bethany Christian Services must fall.

The circuit court agreed. It noted the opinions issued by this Court in *Triplett v St Amour*, 444 Mich 170; 507 NW2d 194 (1993), and indicated its view that the proper rule was stated in the treatise material[18] cited by this Court in *Columbia Casualty Co v Klettke*, 259 Mich 564, 565-566; 244 NW 164 (1932):

"The courts hold that perjury is intrinsic fraud and that therefore it is not ground for equitable relief against a judgment resulting from it. We have seen that the fraud which warrants equity in interfering with such a solemn thing as a judgment ·must be fraud in obtaining the judgment, and must be such as prevents the losing party from having an adversary trial of the issue. Perjury is a fraud in obtaining the judgment, but it does not prevent an adversary trial. The losing party is before the court and is well able to make his defense. His opponent does nothing to prevent it. This rule seems harsh, for often a party will lose valuable rights because of the perjury of his adversary. However, public policy seems to demand that there be an end to litigation. If perjury were accepted as a ground for relief, litigation might be endless; the same issues would have to be tried repeatedly. As stated in a leading case, 'the wrong, in such case, is of course a most grievous one, and no doubt the legislature and the courts would be glad to redress it if a rule could be devised that would remedy the evil without producing mischiefs far worse than the evil to be remedied. Endless litigation, in which nothing was ever finally determined, would be worse than occasional miscarriages of justice; and so the rule is, that a final judgment cannot be annulled merely because it can be shown to have been

---

[18] *Pomeroy's Equitable Remedies* (2d ed), § 656, published as *Pomeroy's Equitable Jurisprudence* (4th ed), § 2077.

based on perjured testimony; for if this could be done once, it could be done again and again *ad infinitum.*' And to use the language of an eminent court, 'the maxim that fraud vitiates every proceeding must be taken, like other general maxims, to apply to cases where proof of fraud is admissible. But where the same matter has been actually tried, or so in issue that it might have been tried, it is not again admissible; the party is estopped to set up such fraud, because the judgment is the highest evidence and cannot be contradicted.' "

After providing that quotation from *Columbia Casualty*, the circuit court concluded its analysis:

Also, in this case, Mr. Daoud did relitigate the effect of the alleged perjury. He did have a motion for rehearing, pursuant to the Court Rule, in front of the Probate Judge. The Probate Judge, having all the information which presumably would be presented to the jury in this case, did not make any change in his determination as to the adoption. Whether we call it Res Judicata (Lisa Vande[] Waa and Bethany Christian Services are not parties per se in the adoption case) or whether it becomes a failure of proximate cause as a matter of law does not have to be decided by this Court. (The proximate cause was not raised by any of the parties in this case. It appears to this Court that, if, after the question of perjury is raised in front of the Probate Judge and even with the new information available to him, the Probate Judge does not change his opinion as to the validity of the adoption, there is then a serious question, in this Court's mind, as to whether or not the fraud, negligence, and civil rights violation could, as a matter of law, be a proximate cause of an injury sustained by the plaintiff in this case.)

The month after the circuit court issued its opinion, Ms. De Leau filed her own motion for summary disposition. She expressly relied on the arguments advanced by Ms. Vande Waa and Bethany Christian

Services. The circuit court granted Ms. De Leau's motion.

Mr. Daoud appealed both orders of summary disposition. In a brief opinion, the Court of Appeals affirmed,[19] adopting as its own the opinion of the circuit court.

We granted Mr. Daoud leave to appeal "limited to whether the witness immunity doctrine bars the plaintiff's suit for damages."[20] 452 Mich 867 (1996).

III

This Court's most recent decision in this realm is *Triplett v St Amour, supra.* Patricia St. Amour was involved in a two-car collision. She and her husband brought a personal injury action against the driver of the other car, Victor P. Triplett. They also sued Mr. Triplett's employer, who owned the vehicle. Ms. St. Amour alleged that the accident had caused a traumatic shoulder dislocation.

In the course of discovery, there was extensive inquiry regarding the shoulder injury. Eventually, the insurer of the vehicle driven by Mr. Triplett settled the case, paying $20,000 to Ms. St. Amour and her husband.

Ms. St. Amour then filed a suit against her own no-fault carrier, which had declined to pay benefits for the accident. That suit led to the disclosure that, less

---

[19] Unpublished memorandum opinion, issued May 19, 1995 (Docket Nos. 171562, 176339).

[20] An electronic review of our decisions finds no prior reference to the doctrine of "witness immunity" in such a context. An alternative statement of the issue could have been whether Mr. Daoud's complaint in circuit court stated a claim on which relief can be granted—whether we should recognize a separate civil cause of action against a person who gives perjured testimony.

than a month before the accident, Ms. St. Amour had been treated for a serious shoulder injury.

That revelation prompted Mr. Triplett, along with his employer and the insurer of the vehicle, to sue Ms. St. Amour and her husband. They alleged that, in the course of discovery in the first suit, the St. Amours had fraudulently concealed her preexisting shoulder injury. Mr. Triplett and the other plaintiffs did not request rescission of the settlement agreement; rather, they sought money damages for the St. Amours' fraud.

The circuit court granted summary disposition for the St. Amours, concluding that an independent action at law for fraud could not be maintained because the prior action was a bar under either res judicata or collateral estoppel principles. The circuit court said that Mr. Triplett and the other plaintiffs were limited to seeking relief from judgment under MCR 2.612(C)(1).[21] In reaching this conclusion, the circuit court relied on *Rogoski v Muskegon*, 107 Mich

---

[21]    On motion and on just terms, the court may relieve a party or the legal representative of a party from a final judgment, order, or proceeding on the following grounds:

(a) Mistake, inadvertence, surprise, or excusable neglect.

(b) Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under MCR 2.611(B).

(c) Fraud (intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party.

(d) The judgment is void.

(e) The judgment has been satisfied, released, or discharged; a prior judgment on which it is based has been reversed or otherwise vacated; or it is no longer equitable that the judgment should have prospective application.

(f) Any other reason justifying relief from the operation of the judgment.

App 730; 309 NW2d 718 (1981),[22] in which the Court of Appeals held that there is no cause of action in Michigan for perjured testimony. It said that a party aggrieved in that fashion may seek relief, but "this relief cannot be by independent action but, rather, must be by motion in the case in which the adverse judgment was rendered." 107 Mich App 737.

The Court of Appeals reversed in *Triplett*. 194 Mich App 335; 486 NW2d 146 (1992). It held that a judgment entered pursuant to an allegedly fraudulently induced settlement agreement does not bar a separate action for damages resulting from the fraud. Distinguishing *Rogoski*, the panel cited *Courtney v Feldstein*, 147 Mich App 70; 382 NW2d 734 (1985), in which the majority allowed a separate suit by a divorce litigant whose settlement had allegedly been the product of fraudulent misrepresentations in the course of the divorce action.[23]

After this Court granted leave to appeal in *Triplett*, several approaches were stated by justices of this Court. In the aggregate, we voted four to three to reverse the judgment of the Court of Appeals and reinstate the summary disposition ordered by the circuit court in favor of the St. Amours.

Justice BOYLE, with Justice MALLETT concurring, wrote the lead opinion to reinstate the circuit court judgment. She said that, "[b]ecause the court rules[24] provide effective remedies and deterrents in the pres-

---

[22] Lv den 414 Mich 887 (1982).

[23] The dissenter in *Courtney*, who would have barred the second suit, observed that resolution of the fraud suit would require redetermination of significant issues that had been litigated and settled in the divorce.

[24] Justice BOYLE focused on the remedies provided by MCR 2.612(C), but also discussed penalties for improper discovery under subchapter 2.300 of the Michigan Court Rules. In addition, she noted the sanctions

ent case, we decline to recognize a new cause of action for fraud under these circumstances." 444 Mich 179.

Concurring in part and dissenting in part, Justice RILEY agreed with Justice BOYLE that a defendant who settles a case may not later bring an action at law for damages, alleging that the settlement was fraudulently induced. However, Justice RILEY would have gone further, and held that a settling *plaintiff* is also limited to the relief available under MCR 2.612(C). Justice RILEY thus indicated her willingness to overrule *Kordis v Auto Owners Ins Co*, 311 Mich 247; 18 NW2d 811 (1945), in which a seriously injured plaintiff who settled an underlying suit for a pittance was allowed to sue the insurer for having induced the settlement by fraudulent representations.

The fourth vote to reverse in *Triplett* was supplied by Justice LEVIN. He joined in the reinstatement of the circuit court judgment "on the authority of *Columbia Casualty Co v Klettke*, 259 Mich 564; 244 NW 164 (1932), and *Fawcett v Atherton*, 298 Mich 362; 299 NW 108 (1941)." 444 Mich 184. Justice LEVIN provided the *Columbia Casualty* quotation found *ante* at 193-194, specifically noting its caution about the feasibility of allowing such suits "without producing mischiefs far worse than the evil to be remedied." 444 Mich 187.

Justice GRIFFIN dissented, with Justice BRICKLEY and Chief Justice CAVANAGH concurring in his opinion. Their three votes were to affirm the decision of the Court of Appeals so that Mr. Triplett and the others

available for improper pleadings and other papers. MCR 2.114(D), (E). 444 Mich 178, n 7.

could proceed with their fraud action against the St. Amours.

IV

Thus we see in *Triplett* a four-justice majority of this Court concluding, in three separate opinions, that Mr. Triplett and his fellow plaintiffs could not go forward with their suit. In the aggregate, the four *Triplett* opinions (including the dissent) offer a full exposition of the law and policy considerations surrounding suits of this sort. Our intention today is not to duplicate that presentation. Rather, we intend simply to decide the present case on the narrow principles with which a majority in *Triplett* were in agreement.

Examining the opinions of Justices BOYLE, RILEY, and LEVIN, it is first apparent that the Court avoided making a sweeping pronouncement regarding all such cases, preferring instead to focus narrowly on the particular situation presented in *Triplett*. While Justice RILEY's opinion emphasized her belief that defrauded plaintiffs and defrauded defendants should be similarly situated, she did not undertake to define the proper approach in all cases of fraud or perjury. And the other three justices in the majority explicitly limited the scope of their analyses.[25]

---

[25] Justice BOYLE's opinion emphasizes the "narrow issue" presented in *Triplett*, and states:

The cases involving the releasers of tort claims in the first action are inapposite. While there appears to be a national split of authority regarding whether a "releasor of a tort claim may stand upon a fraudulently induced release and maintain a separate fraud action" or is limited to rescinding the settlement agreement and pursuing the original claim, neither the cases from foreign jurisdictions nor Michigan precedent supports what the plaintiff asks this Court to

The principal teaching of *Triplett* is that the court rules are a primary source for determining the means by which a person aggrieved by a judgment may seek to remedy the situation. The opinions of Justices BOYLE and RILEY are closely tied to the availability of relief under MCR 2.612(C). Justice LEVIN emphasizes another aspect of this point—the reluctance to fashion a new cause of action where the court rules already provide a framework for relief.

Indeed, one can paraphrase the last sentences of the opinions of Justice BOYLE, 444 Mich 179, and of Justice RILEY, 444 Mich 183, in this manner: Where statutes and court rules provide effective means for dealing with a judgment fraudulently obtained through perjury, it is neither sound law nor sound policy to permit a separate cause of action for fraud.

Indeed, the dissenters in *Triplett* were likewise careful to offer a narrow statement of their position.[26]

---

today recognize—the ability of the tortfeasor in the original action to stand upon the plaintiff's release and sue for fraud. The public policy justifications for recognizing a fraud suit in the above circumstances are not present here. [444 Mich 177-178 (citations omitted).]

Justice LEVIN likewise noted the limits of his opinion:

This is not a case in which the plaintiff was persuaded to settle a substantial claim because of misrepresentation by an insurer or its representative concerning policy limits. Nor is this a case in which a spouse concealed assets before entering into a separation agreement. Different policy considerations might, depending on all the circumstances, justify a different rule in such cases. [444 Mich 186.]

[26] The dissent in *Triplett* stated:

The present holding pertains to only one of several subcategories of situations covered by MCR 2.612—those cases involving fraudulently induced settlement agreements. MCR 2.612 addresses many other grounds for setting aside a judgment (not limited to settle-

Bringing these threads together allows resolution of the present case. Most importantly, it appears that the rules permitted Mr. Daoud access to the probate court for the purpose of righting the perceived wrong. Without deciding the applicability of MCR 2.612(C) in this setting,[27] we observe that Mr. Daoud did exercise the opportunity to return to probate court and present fully the circumstances that underlie the present complaint.[28] Insofar as Mr. Daoud's complaints concern misrepresentations and misconduct in connection with his attempts to exercise visitation, he also had the option of seeking appropriate relief in the Kent Circuit Court divorce action.[29]

As the dissenting judge noted in *Courtney*, where the court (here, the probate court) allows the aggrieved litigant to return and petition for relief on the basis of the alleged perjury, maintenance of a second suit for fraud would necessarily require redetermination of matters litigated to judgment in the first suit. With regard to most of Mr. Daoud's key allegations, Ms. De Leau denies wrongdoing. This is exactly

---

ment agreements) and will continue to remain the appropriate avenue of relief in those instances. [444 Mich 208.]

In keeping with that narrow focus on fraudulently induced *settlement agreements*, the dissenters earlier noted the applicability of certain principles of contract law. 444 Mich 204-208.

[27] The rules applicable in other civil proceedings are applicable in probate court, except as modified in Chapter 5 of the Michigan Court Rules. MCR 5.001(A).

[28] The appellate course followed by this matter following the Ottawa Probate Court's denial of rehearing is not clear because there are several bases on which the Court of Appeals could have found the appeal untimely (see n 12). However, a properly presented appeal would have given Mr. Daoud another opportunity to obtain relief.

[29] We need not decide whether, late in these proceedings, the divorce court could have issued a helpful order with regard to the status of David. At a minimum, however, Mr. Daoud could have sought a finding that Ms. De Leau was in contempt of court. It also appears that Mr. Hoogeboom, in filing a circuit court motion to bar adoption proceedings, saw the circuit court as a source of protection early in this case.

the factual domain resolved, initially in the probate court proceedings concerning termination, and later in the probate proceedings on Mr. Daoud's motion for rehearing. The circuit court in the present case made a related point in its discussion of proximate cause.

The confluence of principles related to res judicata, collateral estoppel, and proximate cause serve to illustrate the logical underpinnings of the general rule giving witnesses immunity from civil suit. The *Columbia Casualty* language quoted *supra* at 193-194 states well that aspect of the matter. If testimony in one suit, accepted by the court but disputed by the losing litigant, can give rise to a second suit, what would prevent a third suit arising from the unsatisfactory outcome of the second? Or a fourth arising from the third?

Witness immunity is also grounded in the need of the judicial system for testimony from witnesses who, taking their oaths, are free of concern that they themselves will be targeted by the loser for further litigation.[30] Absent perjury of a character requiring action by the prosecuting attorney, the testimony of a witness is to be weighed by the factfinder in the matter

---

[30] We do not employ today the immunity stated in MCR 5.924, which is argued by the parties. It provides:

   Persons or agencies providing testimony, reports, or other information relevant and material to the proceedings following authorization of a petition, and at the request of the court, are immune from any subsequent legal action with respect to furnishing the information to the court.

That rule was drawn from former MCR 5.907(B)(6) and JCR 7.2(e)(4). According to the staff comment of MCR 5.924, it provides "that judicial immunity extends to those who furnish reports on court request." If that is the proper reading of the rule, then it would not apply to Ms. De Leau, even if it were applicable to Ms. Vande Waa or Bethany Christian Services.

   Note, however, the different interpretation provided in *Bolton v Jones*, 156 Mich App 642, 652-654; 401 NW2d 894 (1986), vacated and remanded 431 Mich 856 (1988), *(On Remand)* 173 Mich App 725; 434 NW2d 415 (1988), reversed on other grounds 433 Mich 861 (1989).

at bar, not by a subsequent jury summoned to determine whether the first lawsuit was tainted by fraud.

Accepting the truth of Mr. Daoud's account, one can be shocked by this outcome. Yet we remain mindful of the sound words of *Columbia Casualty.* "[T]he wrong, in such case, is of course a most grievous one, and no doubt the legislature and the courts would be glad to redress it if a rule could be devised that would remedy the evil without producing mischiefs far worse than the evil to be remedied." 259 Mich 566.

In the end, the rule of *Triplett* is that a second suit for fraud, based on perjury ("intrinsic fraud"), may not be filed against a person involved in a first suit, if the statutes and court rules provide an avenue for bringing the fraud to the attention of the first court and asking for relief there. Whether a second suit is allowed in other circumstances is a question not presented in *Triplett* or in this case.[31]

Under the court rules, Mr. Daoud was able to seek a remedy for the alleged perjury in the Ottawa Probate Court. He could also have asked the judge in the Kent Circuit Court divorce action to issue an order regarding the alleged misrepresentations concerning visitation. Taking as true the facts alleged by Mr. Daoud in his Kent Circuit Court civil action for fraud, he has failed to state a claim on which relief can be granted. Accordingly, we affirm the judgments of the Court of Appeals and the circuit court.

MALLETT, C.J., and BRICKLEY, CAVANAGH, BOYLE, RILEY, WEAVER, and KELLY, JJ., concurred.

---

[31] We express no opinion about whether Mr. Daoud established that there was an *extrinsic* fraud that prevented him from effectively contesting the termination of his parental rights in an adversarial proceeding, or whether such a fraud would allow him to bring an independent action for money damages. Mr. Daoud did not brief the issue of extrinsic fraud.