MAIDEN v ROZWOOD
RENO v CHUNG

Docket Nos. 107936, 110035. Argued January 22, 1999 (Calendar Nos. 14-
    15). Decided July 30, 1999. Rehearing denied in *Maiden, post,* 1205.

Sadie Maiden, as personal representative of the estate of Leith
    Maiden, deceased, brought an action in the Wayne Circuit Court
    against the Michigan Department of Health, the Southgate Regional
    Center, and Henry J. Rozwood and other employees of the center
    for the wrongful death of Leith Maiden, while a resident of the
    center. The plaintiff alleged that the individual defendants' conduct
    was grossly negligent within the meaning of the governmental
    immunity statute and thus not immune from liability. The court,
    Michael J. Talbot, J., granted summary disposition for the defend-
    ants, concluding that nothing in the record showed that defendants'
    actions rose to the level of gross negligence as defined by MCL
    691.1407(2)(c); MSA 3.996(107)(2)(c). The Court of Appeals, WHITE,
    P.J., and HOOD and GRIBBS, JJ., reversed and remanded in an unpub-
    lished order, holding that genuine issues of material fact existed
    (Docket No. 200635). The defendants appeal.

Kenneth Reno brought an action in the Wayne Circuit Court against
    Yung A. Chung, M.D., a Wayne County assistant medical examiner,
    and others, alleging gross negligence in the performance of autop-
    sies on his wife and daughter, which eventually led to his arrest
    and being charged with their murders. Experts consulted by the
    prosecutor in preparation for trial discredited Dr. Chung's conclu-
    sions, and the charges were dismissed. Other persons later con-
    fessed to and were convicted of the crimes. The court, Diane M.
    Hathaway, J., granted summary disposition for Dr. Chung under
    MCR 2.116(C)(8), (10). The Court of Appeals, MACKENZIE, P.J., and
    CAVANAGH, J. (T. L. LUDINGTON, J., dissenting), affirmed, finding that
    the defendant owed no duty to the plaintiff under the public duty
    doctrine and that no special relationship existed between the plain-
    tiff and the defendant. 220 Mich App 102 (1996) (Docket No.
    175158). The plaintiff appeals.

In an opinion by Justice CORRIGAN, joined by Chief Justice
    WEAVER, and Justices TAYLOR and YOUNG, the Supreme Court *held:*

In *Maiden*, the plaintiff failed to present evidence of gross negligence sufficient to overcome governmental immunity. In *Reno*, although the plaintiff presented a material question of fact regarding defendant Chung's gross negligence, his claim fails as a matter of law because the defendant owed no duty to him.

1. Government officers and employees acting within the scope of their authority generally are immune from tort liability, provided that their actions are not grossly negligent. Gross negligence is defined by MCL 691.1407(2)(c); MSA 3.996(107)(2)(c) as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Evidence of ordinary negligence does not create a material question of fact concerning gross negligence. The content or substance of the evidence proffered must be admissible in evidence.

2. In *Maiden*, the plaintiff's proofs in opposition to the defendants' motion for summary disposition failed to raise a material question that the defendant employees' conduct was so reckless as to demonstrate a substantial lack of concern for whether an injury would result. The plaintiff failed to meet her burden of coming forward with specific facts to support her claim that the defendants' conduct was grossly negligent. On the basis of the record, reasonable minds could not differ. Accordingly, the trial court properly granted summary disposition for the defendants. In *Reno*, the plaintiff's proofs in opposition to the motion for summary disposition raised a material question of fact regarding the statutory standard for gross negligence. However, the defendant owed no duty to the plaintiff under the public duty doctrine or traditional duty principles. The gross negligence claim is unenforceable as a matter of law, and summary disposition was properly granted under MCR 2.116(C)(8).

3. A county medical examiner must investigate the cause of death in all cases of persons who meet a violent death. Further, a medical examiner may be required to testify in behalf of the state in any matter arising as the result of any investigation required under MCL 52.212; MSA 5.953(12), and must testify in behalf of the state. Nothing in the statutory scheme has created duties to a criminal defendant; instead, the duty is owed to the state. While an injury to a wrongly accused criminal defendant from erroneous findings is foreseeable, the express language of the statute requiring medical examiners to testify on behalf of the state militates against imposing any duty on defendant Chung to the plaintiff as a consequence of her incompetent medical findings and testimony.

4. Defendant Chung's role as the state's factual and expert witness at the plaintiff's preliminary examination was plainly adver-

sarial to the plaintiff's interests. The duty imposed on a witness generally is owed to the court, not the adverse party. A breach of that duty does not give rise to a cause of action in tort by the adverse party. Further, witnesses who testify during the course of judicial proceedings enjoy quasi-judicial immunity. Statements made during the course of judicial proceedings are absolutely privileged, provided they are relevant, material, or pertinent to the issue being tried. Falsity or malice on the part of the witness does not abrogate the privilege. The privilege should be liberally construed so that participants in judicial proceedings are free to express themselves without fear of retaliation. The autopsy, investigating the circumstances surrounding the death in question, was performed under statutory mandate and was a necessary predicate to the defendant's statutorily compelled testimony.

*Maiden,* reversed.

*Reno,* affirmed.

Justice KELLY, joined by Justices BRICKLEY and CAVANAGH, dissenting, stated that in *Maiden* the plaintiff has presented sufficient evidence of defendants' gross negligence to survive a motion for summary disposition. In *Reno,* the defendant owed a duty to the plaintiff that supported a cause of action for gross negligence under the governmental immunity statute.

In *Maiden,* in finding a lack of gross negligence on the part of the defendants, the majority erroneously concludes that the statement by defendant Myles was inadmissible hearsay and, therefore, may not be considered by the Supreme Court. In addition, it needlessly engages in a discussion concerning evidence admissibility under MCR 2.116(G)(4) and whether that rule henceforth is to be read as mirroring Federal Rule of Civil Procedure 56(e). That discussion is unnecessary to answer the question actually presented, and, hence, is irrelevant. Further, the majority incorrectly states that Myles' statement was not admissible under MRE 801(d)(2)(A). Myles is a named defendant. The evidence in question is directly probative of his negligence and is his own statement to police. While the trial court may be required to give a limiting instruction to the jury regarding its use concerning the negligence of the other individual defendants, for purposes of summary disposition, the evidence is clearly admissible under MRE 801(d)(2)(A). The plaintiff provided a significant amount of factual support in the record to establish gross negligence on the part of the defendants. Reviewing the evidence in the light most favorable to the plaintiff, the facts support her assertion that a jury reasonably could find that the defendants' actions constituted gross negligence.

In *Reno*, the defendant owed a duty to the plaintiff that supports a cause of action for gross negligence under the governmental immunity statute. However, the majority essentially grants an absolute immunity to any government employee who has statutorily enumerated duties. Further, it misconstrues the nature of the plaintiff's claim. The plaintiff does not allege that the defendant failed to perform her statutory duties; rather, he argues that she performed the autopsy in a grossly negligent manner, and that she tried to hide the evidence of it afterward. While the defendant owes a duty to the state to autopsy certain decedents, and the plaintiff cannot hold her liable for failing to autopsy a certain body, once she undertakes an autopsy, a duty to another may attach, depending on how she performs her work.

Whether a duty exists in a particular case is a question of law to be decided by the court. In this case, the factors weigh in favor of finding an enforceable duty. The injury to the plaintiff was actually and directly foreseeable by the defendant. The defendant was well aware that her opinion would play a major part in the decision to charge and incarcerate the plaintiff. The performance of the defendant's duties clearly affected the plaintiff in a manner different from the general public. In addition, the burden on the defendant to perform her duties without gross negligence was minimal, and the risk presented by her negligence was serious. The defendant not only negligently failed to correctly perform the autopsies, she refused to cooperate with the prosecutor when he attempted to substantiate her findings. She forced the prosecutor to obtain a court order to examine forensic evidence, causing greater delay in the innocent plaintiff's release from incarceration.

*Law Offices of David J. Cooper, P.C.* (by *David J. Cooper*), and *Bendure & Thomas* (by *Mark R. Bendure*) for plaintiff-appellee Maiden.

*Donald M. Fulkerson* for plaintiff-appellant Reno.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Santiago Rios, Jessica E. LePine*, and *Michael C. McDaniel*, Assistant Attorneys General, for defendants-appellants in *Maiden*.

*Plunkett & Cooney, P.C.* (by *Christine D. Oldani* and *Mary Massaron Ross*), for defendant-appellee in *Reno*.

CORRIGAN, J. In these consolidated cases, we granted leave to decide the quantum of proof required to survive a motion for summary disposition in gross negligence actions involving government employees under MCL 691.1407(2)(c); MSA 3.996(107)(2)(c). In *Maiden v Radwood*,[1] unpublished order of the Court of Appeals, entered June 26, 1997 (Docket No. 200635), we hold that plaintiff has failed to present evidence of gross negligence sufficient to overcome the immunity conferred by statute. Therefore, we reverse the decision of the Court of Appeals and reinstate the trial court's order. In *Reno v Chung*, although plaintiff presented a material question of fact regarding defendant Chung's gross negligence, we hold that plaintiff's claim fails as a matter of law because defendant owed no duty to plaintiff. We therefore affirm the decision of the Court of Appeals, 220 Mich App 102; 559 NW2d 308 (1996).

I. UNDERLYING FACTS AND PROCEDURAL HISTORY

A. *MAIDEN v ROZWOOD*

Plaintiff's decedent, Leith Maiden, was a resident at the Southgate Regional Center, a state mental health facility. He had been diagnosed as a paranoid schizophrenic with adjustment disorder and disturbances of conduct and mood. On June 9, 1994, Maiden, who

---

[1] Throughout the lower court proceedings, Henry James Rozwood is erroneously referred to as Radwood.

was 5'6" tall and weighed 240 pounds, became physically and verbally abusive toward another resident, striking the other resident twice. Paul Troy, a resident care aide, then escorted Maiden back to his assigned residence in another building.

En route to the residence, Maiden announced that he was not returning to the residence and began "wandering off." Troy enlisted the help of defendants Betty Jo Szabo, a licensed practical nurse, and Henry Rozwood, another resident care aide, to escort Maiden to his room. When Maiden entered the building, he ran to the dining room where he immediately caused another disturbance. He yelled, swore, and knocked over furniture in the proximity of other residents. Other staff and residents present in the dining room scurried away from the flying tables and chairs. Defendants Troy, Szabo, and Rozwood attempted to calm Maiden verbally without success.

Maiden struck defendant Troy in the head, knocking him to the floor. Troy lost his glasses and was momentarily dazed. Maiden also attempted to strike Rozwood, and during the struggle they both fell to the floor. Rozwood then sat on Maiden's buttocks in an effort to restrain him, but he was bucked off to Maiden's left side. Rozwood then leaned on Maiden's left shoulder and held his left arm as he lay face down on the floor. After Maiden thrashed about and attempted to bite defendant Szabo, Rozwood held the back of Maiden's head to prevent him from biting anyone. Troy held Maiden's left arm. Defendant Karl Myles, a fire and safety officer who also had been called to assist, straddled Maiden's legs and told him to calm down.

Maiden was asked if he was all right, to which he replied "yeah." Maiden was then asked if he had settled down, to which he replied "uh-huh." Myles told Maiden to place his hands behind his back and calm down. Maiden placed his arms against his body after the staff released him. Maiden suddenly went limp and stopped breathing. Szabo and Rozwood immediately initiated resuscitation efforts. An ambulance was called, and resuscitation efforts continued until Maiden reached the hospital, where he was pronounced dead.

Defendants Rozwood and Szabo estimated that the entire incident lasted two to three minutes, while another staff member estimated that Maiden was held down five to ten minutes. The medical examiner opined that Maiden's death was caused by "positional and/or compression asphyxia" and the "manner of death was an accident."

Plaintiff filed a wrongful death suit, naming as defendants the regional mental health facility, the Michigan Department of Community Health, and the four employees who participated in the attempt to restrain Maiden. The circuit court dismissed the complaint against the mental health facility and the Department of Community Health on the basis of governmental immunity. MCL 691.1407(1); MSA 3.996(107)(1). No issues involving these defendants were raised on appeal.

The complaint alleged that the individual defendants' conduct was grossly negligent within the meaning of the statute and thus not immune from liability. MCL 691.1407(2)(c); MSA 3.996(107)(2)(c).

Defendants moved for summary disposition under MCR 2.116(C)(10). The trial court granted the motion,

concluding that nothing in the record showed that defendants' actions "rose to the level of gross negligence as defined by the law . . . ." The Court of Appeals thereafter granted plaintiff's motion for peremptory reversal, vacated the order granting summary disposition, and remanded for further proceedings, holding that genuine issues of material fact existed. We granted leave to appeal. 458 Mich 875 (1998).

B. *RENO v CHUNG*

On May 10, 1991, plaintiff arrived home and discovered that his wife, Carlynne, and daughter, Robin, had been brutally stabbed. Plaintiff's wife was already dead, but Robin was still alive. Her throat had been cut. She identified an acquaintance named Tommy Collins as their assailant just before she died. Plaintiff subsequently related his daughter's dying words to the police.

Both Collins and plaintiff were suspects in the double murder. The police investigation quickly focused on plaintiff after defendant, a Wayne County assistant medical examiner, performed autopsies on the decedents and opined that the stab wounds to Robin's neck made her unable to speak. On the basis of this information, plaintiff was arrested and charged with murder. He was bound over after a preliminary examination at which defendant testified that plaintiff's daughter could not possibly have implicated Tommy Collins, given the nature of the injuries to her throat.

In preparation for plaintiff's murder trial, the prosecutor consulted a pathologist, Dr. Laurence Simson,

M.D., the Ingham County Medical Examiner, and an otolaryngologist, Dr. Robert Mathog, Chairman of Otolaryngology at Wayne State University, to corroborate defendant's opinion. Defendant thereafter refused to turn over records and specimens to the prosecutor for the experts' review, requiring that the prosecution obtain a court order to compel her compliance.

Rather than corroborate defendant's conclusions, both experts stated that defendant's findings and conclusions were completely wrong. Both experts found that defendant's conclusions regarding the victim's ability to speak had no anatomical or physiological basis. Both experts unequivocally opined that the victim's neck injuries would not have prevented her from speaking.

Because defendant's conclusions had been discredited, the prosecutor dismissed the charges against plaintiff.[2] Ten months later, plaintiff sued defendant and other parties, alleging that defendant had been grossly negligent. Defendant moved for summary disposition under MCR 2.116(C)(7), (8) and (10), claiming that she owed no duty to plaintiff, that her conduct was not grossly negligent and that she was entitled to witness immunity. The trial court granted the motion under both MCR 2.116(C)(8) and (10), finding for defendant on all issues.

Plaintiff appealed. In a divided opinion, the Court of Appeals affirmed the order granting summary disposition. The majority found that defendant owed no duty to plaintiff under the public duty doctrine and that no special relationship existed between plaintiff

---

[2] Tommy Collins thereafter confessed to the crime. He and a co-conspirator were later convicted and sentenced for the double murders.

and defendant. The dissenting judge found that defendant owed a duty to plaintiff and that plaintiff had presented a material question of fact regarding defendant's gross negligence. We granted leave to appeal, limited to (1) whether the Court of Appeals erred in holding that the defendant had no special relationship and owed no duty to the plaintiff, and (2) whether the trial court clearly erred in holding that the plaintiff had failed to present a material fact question regarding defendant's gross negligence under MCL 691.1407(2)(c); MSA 3.996(107)(2)(c). 457 Mich 864 (1998).

## II. GOVERNING LEGAL STANDARDS

This Court reviews the grant or denial of summary disposition de novo to determine if the moving party is entitled to judgment as a matter of law. In making this determination, the Court reviews the entire record to determine whether defendant was entitled to summary disposition. *Groncki v Detroit Edison Co*, 453 Mich 644, 649; 557 NW2d 289 (1996) (opinion of Brickley, C.J.).

In *Maiden*, the trial court granted summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact). In *Reno*, the trial court granted summary disposition on the basis of both MCR 2.116(C)(8) (failure to state a claim upon which relief can be granted) and MCR 2.116(C)(10). MCR 2.116(C)(7) permits summary disposition where the claim is barred by immunity.[3] The appropriate

---

[3] MCR 2.116(C)(7) permits summary disposition where "[t]he claim is barred because of release, payment, prior judgment, immunity granted by law, statute of limitations, statute of frauds, an agreement to arbitrate,

grounds for granting summary disposition in *Reno* are MCR 2.116(C)(7), (8).

## A. LEGAL STANDARD UNDER MCR 2.116(C)(7)

A party may support a motion under MCR 2.116(C)(7) by affidavits, depositions, admissions, or other documentary evidence. If such material is submitted, it must be considered. MCR 2.116(G)(5). Moreover, the substance or content of the supporting proofs must be admissible in evidence. See part III. Unlike a motion under subsection (C)(10), a movant under MCR 2.116(C)(7) is not required to file supportive material, and the opposing party need not reply with supportive material. The contents of the complaint are accepted as true unless contradicted by documentation submitted by the movant. *Patterson v Kleiman*, 447 Mich 429, 434, n 6; 526 NW2d 879 (1994).

## B. LEGAL STANDARD UNDER MCR 2.116(C)(8)

A motion under MCR 2.116(C)(8) tests the legal sufficiency of the complaint. All well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant. *Wade v Dep't of Corrections*, 439 Mich 158, 162; 483 NW2d 26 (1992). A motion under MCR 2.116(C)(8) may be granted only where the claims alleged are "so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." *Id.* at 163. When deciding a motion brought under this sec-

---

infancy or other disability of the moving party, or assignment or other disposition of the claim before commencement of the action."

tion, a court considers only the pleadings. MCR
2.116(G)(5).

### C. LEGAL STANDARD UNDER MCR 2.116(C)(10)

A motion under MCR 2.116(C)(10) tests the factual
sufficiency of the complaint. In evaluating a motion
for summary disposition brought under this subsec-
tion, a trial court considers affidavits, pleadings, dep-
ositions, admissions, and other evidence submitted by
the parties, MCR 2.116(G)(5), in the light most
favorable to the party opposing the motion. Where
the proffered evidence fails to establish a genuine
issue regarding any material fact, the moving party is
entitled to judgment as a matter of law. MCR
2.116(C)(10), (G)(4). *Quinto v Cross & Peters Co*,
451 Mich 358; 547 NW2d 314 (1996).

The plaintiff relies on *Rizzo v Kretschmer*, 389
Mich 363; 207 NW2d 316 (1973), for the proposition
that a motion for summary disposition under MCR
2.116(C)(10) is properly granted where it is impossi-
ble for the claim to be supported by evidence at trial.
In fact, the 1985 amendment of the court rules super-
seded the standard described in *Rizzo. McCart v
J Walter Thompson USA, Inc*, 437 Mich 109, 115, n 4;
469 NW2d 284 (1991).

MCR 2.116(G)(4) requires:

> A motion under subrule (C)(10) must specifically identify
> the issues as to which the moving party believes there is no
> genuine issue as to any material fact. When a motion under
> subrule (C)(10) is made and supported as provided in this
> rule, an adverse party may not rest upon the mere allega-
> tions or denials of his or her pleading, but must, by affida-
> vits or as otherwise provided in this rule, set forth specific
> facts showing that there is a genuine issue for trial. If the

> adverse party does not so respond, judgment, if appropriate, shall be entered against him or her.

A litigant's mere pledge to establish an issue of fact at trial cannot survive summary disposition under MCR 2.116(C)(10). The court rule plainly requires the adverse party to set forth specific facts at the time of the motion showing a genuine issue for trial.

Today we clarify the correct legal standard under MCR 2.116(C)(10) because our Court has inconsistently applied the standard since the 1985 amendment of the court rules. Compare *Johnson v Detroit*, 457 Mich 695; 579 NW2d 895 (1998); *Oakland Co Bd of Co Rd Comm'rs v Michigan Property & Casualty Guaranty Ass'n*, 456 Mich 590; 575 NW2d 751 (1998); *Landelius v Sackellares*, 453 Mich 470; 556 NW2d 472 (1996); *Quinto v Cross & Peters Co, supra*, with *Lytle v Malady (On Rehearing)*, 458 Mich 153; 579 NW2d 906 (1998); *Weymers v Khera*, 454 Mich 639; 563 NW2d 647 (1997); *Radtke v Everett*, 442 Mich 368; 501 NW2d 155 (1993); *Farm Bureau Mut Ins Co of Michigan v Stark*, 437 Mich 175; 468 NW2d 498 (1991). The reviewing court should evaluate a motion for summary disposition under MCR 2.116(C)(10) by considering the substantively admissible evidence actually proffered in opposition to the motion. A reviewing court may not employ a standard citing the mere possibility that the claim might be supported by evidence produced at trial. A mere promise is insufficient under our court rules.

### III. GROSS NEGLIGENCE

Generally, government officers and employees acting within the scope of their authority are immune

from tort liability, provided that their actions are not grossly negligent. The plain language of the governmental immunity statute indicates that the Legislature limited employee liability to situations where the contested conduct was substantially more than negligent. Gross negligence is defined by statute as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(2)(c); MSA 3.996(107)(2)(c). With this statutory definition in mind, we consider the proof sufficient to survive summary disposition of a gross negligence claim against a government employee.

In *Jackson v Saginaw Co*, 458 Mich 141; 580 NW2d 870 (1998), the plaintiff sued the Saginaw County jail physician, claiming that the doctor was grossly negligent in failing to diagnose the plaintiff's throat cancer. This Court upheld the order granting summary disposition for the defendant county. Agreeing with the trial court that reasonable minds could not differ in concluding that the defendant's conduct was not grossly negligent, this Court stated:

> As we have noted, it appears that the deposition testimony offered to the trial court fails to raise a question whether the defendant even violated the standard of care applicable to him and therefore would be guilty of negligence. There is, however, clearly no testimony at all offered to support a notion that his conduct would be so reckless as to demonstrate a substantial lack of concern for whether an injury results. [*Id.* at 150-151.]

The logical import of *Jackson*, consistent with the statutory definition of gross negligence, is that evidence of ordinary negligence does not create a ma-

terial question of fact concerning gross negligence.[4]
Rather, a plaintiff must adduce proof of conduct "so
reckless as to demonstrate a substantial lack of con-
cern for whether an injury results." To hold otherwise
would create a jury question premised on something
less than the statutory standard.

In addition to requiring that a plaintiff show reck-
less conduct, the content or substance of the evi-
dence proffered must be admissible in evidence. In
*Lytle v Malady, supra,* this Court clarified the eviden-
tiary standard required to survive summary disposi-
tion in age and gender discrimination claims. The
*Lytle* Court stated:

> [W]e find that, in the context of summary disposition, a
> plaintiff must prove discrimination with *admissible evi-
> dence,* either direct or circumstantial, sufficient to permit a
> reasonable trier of fact to conclude that discrimination was
> a motivating factor for the adverse action taken by the
> employer toward the plaintiff. [*Id.* at 176 (emphasis
> added).]

No principle requires a higher evidentiary standard to
support a material question of fact for age and gender
discrimination claims and a lower standard in support
of gross negligence claims. Therefore, only evidence
whose content or substance is admissible can estab-
lish the existence of gross negligence as statutorily
defined.[5] See also *Pauley v Hall,* 124 Mich App 255;

---

[4] See also *Harris v Univ of Michigan Bd of Regents,* 219 Mich App 679,
694; 558 NW2d 225 (1996); *Vermilya v Dunham,* 195 Mich App 79, 83; 489
NW2d 496 (1992).

[5] Demanding that evidence be substantively admissible is consistent
with MCR 2.116(G)(4), which requires that an adverse party "set forth spe-
cific facts showing that there is a genuine issue for trial." By presenting
inadmissible hearsay evidence, a nonmoving party is actually promising to
create an issue for trial where the promise is incapable of being fulfilled.

335 NW2d 197 (1983); *SSC Associates Ltd Partnership v General Retirement System of Detroit*, 192 Mich App 360; 480 NW2d 275 (1991). This requirement is consistent with the predecessor rule, GCR 1963, 117.3, and the plurality opinion in *Durant v Stahlin*, 375 Mich 628, 638-639, 657; 135 NW2d 392 (1965), as well as the federal evidentiary standard for summary judgment under FR Civ P 56(e).[6]

### A. *MAIDEN v ROZWOOD*

In opposing defendant's motion for summary disposition, plaintiff presented excerpts of the deposition of witnesses, portions of a Michigan State Police Supplemental Report dated June 23, 1994, portions of an incident report prepared by the employees, and the medical examiner's report.

The excerpts of the supplemental police report are inadmissible hearsay when offered against codefendants Troy and Rozwood.[7] The police report itself is plausibly admissible under the business record exception, MRE 803(6). The statement in the police report

---

The nonmovant is not *showing* that a genuine issue exists. Permitting inadmissible evidence to suffice in opposing summary disposition would require less than the pre-1985 court rule and create illusory fact issues.

[6] Under FR Civ P 56, a plaintiff is required "to present evidence of evidentiary quality—either admissible documents or attested testimony, such as that found in depositions or in affidavits—demonstrating the existence of a genuine issue of material fact. The evidence need not be in admissible form; affidavits are ordinarily not admissible evidence at a trial. But it must be admissible in content . . . . Occasional statements in cases that the party opposing summary judgment must present admissible evidence . . . should be understood in this light, as referring to the content or substance, rather than the form, of the submission." *Winskunas v Birnbaum*, 23 F3d 1264, 1267-1268 (CA 7, 1994) (internal citations omitted).

[7] The supplemental police report indicates that "Mr. Myles states that Paul Troy was lying across Leith's back and Henry Rozwood was lying across Leith's upper back and shoulder area."

attributed to defendant Myles, describing the actions
of defendants Troy and Rozwood, is hearsay. When
the document to be admitted contains a second level
of hearsay, it also must qualify under an exception to
the hearsay rule. *Merrow v Bofferding*, 458 Mich 617;
581 NW2d 696 (1998). Because Myles' statement to
the police describing the actions of the codefendants
does not fall within any of the enumerated hearsay
exceptions, the police report is inadmissible and may
not be considered in opposing the motion for sum-
mary disposition.[8]

The information contained in the remaining docu-
ments, viewed in a light most favorable to the plain-
tiff, reveals that a staff member may have lain across
the decedent's upper body using an unapproved
restraint technique, a staff member momentarily held
the back of decedent's head to prevent biting, and
that the incident may have lasted as long as five to

_____

[8] The dissent essentially concedes that Myles' statement in the police
report is inadmissible against defendants Rozwood and Troy. *Post* at 139-
140. This is properly so, for the evidence is rank hearsay, not appropri-
ately considered in deciding whether plaintiff has met his burden in estab-
lishing gross negligence against Rozwood and Troy. A party admission
under MRE 801(d)(2)(A) is "simply words or actions inconsistent with the
party's position at trial, relevant to the substantive issues in the case, and
offered against the party." 2 McCormick, Evidence (4th ed), § 254, p 142.
The evidentiary rule requires that the statement: (1) be offered against a
party and (2) be the party's own statement, either in an individual or rep-
resentative capacity.

While Myles' statement that his coworkers laid across Maiden's back is
plausibly admissible against Myles himself, the statement does not estab-
lish or advance a genuine issue of material fact regarding his own gross
negligence. In any event, the statement was not offered to establish Myles'
gross negligence, but the gross negligence of Myles' coworkers. While the
statement may be used to impeach Myles under MRE 613(b), it may not
be offered for the truth of the matter asserted to create a genuine issue of
material fact regarding the codefendants.

ten minutes.[9] The uncontroverted evidence estab-
lishes that the decedent was out of control during his
outburst and posed a serious danger to himself and
others. The staff attempted verbal redirection without
success. Maiden struck another patient twice, threw
furniture in a confined area with other residents pres-
ent, hit staff members, and attempted to bite them.
The imminent danger posed by decedent's volatile
behavior required that the staff exercise split-second

---

[9] Plaintiff also submitted excerpts from a supplemental police report,
indicating that a police officer observed discoloration on the decedent's
neck. The officer observed decedent's neck at the funeral home five days
after his death, well after the body had been embalmed. The medical
examiner's report contains no indication of any significant abnormality
about the neck. Further, no evidence suggests that the discoloration
resulted from any employee's restraint efforts. Considering that physicians
performed advanced life support for approximately thirty minutes and the
body was embalmed in the time between the incident and the police
officer's observations, an inference that the discoloration directly resulted
from the restraint is speculative at best.

Both the dissent and plaintiff's brief cite Harrison, Principles of Internal
Medicine (12th ed), and its discussion of Anoxic-Ischemic Encephalop-
athy to further the claim that a fact question exists regarding whether
defendants' actions were grossly negligent.

This evidence was not properly before the court. Plaintiff offered the
textbook passages for the first time in support of its motion for rehearing.
In ruling on a motion for summary disposition, a court considers the evi-
dence then available to it. Accordingly, in ruling on the propriety of the
trial court's grant of defendant's motion for summary disposition, we do
not consider the textbook evidence. *Quinto v Cross & Peters Co, supra* at
366. See also *Grand Rapids v Harper*, 25 Mich App 447, 449; 181 NW2d
581 (1970) ("In reviewing the granting of summary judgment, we are gov-
erned only by what was then before the trial court—the complaint,
answer, depositions and affidavits—and not by what the [nonmovant]
raises" on appeal for the first time).

The dissent contends that the textbook evidence was properly before
the trial court because the motion for rehearing was submitted after the
summary disposition motion was argued, but before the trial court issued
its written order. This argument implicitly demands that the trial court
treat plaintiff's motion for rehearing as a motion to amend the original
pleadings. We decline to impose such a requirement, conspicuously absent
in the court rules, where proper amendment to the pleadings was possible
under MCR 2.118(A)(2).

judgment in deciding how and when to use physical intervention. While they might have used other means to restrain Maiden, reasonable minds could not agree that the failure to employ those alternatives was so reckless "as to demonstrate a substantial lack of concern for whether an injury results."

Plaintiff essentially argues that because Maiden died of compressional asphyxia after being restrained, gross negligence is presumed. Plaintiff thus employs the doctrine of res ipsa loquitur to establish the existence of gross negligence.[10] "The major purpose of the doctrine of res ipsa loquitur is to create at least an inference of negligence when the plaintiff is unable to prove the actual occurrence of a negligent act." *Jones v Porretta*, 428 Mich 132, 150; 405 NW2d 863 (1987). While the doctrine of res ipsa loquitur may assist in establishing ordinary negligence, the doctrine is not available where the requisite standard of conduct is gross negligence or wilful and wanton misconduct. See Prosser & Keeton, Torts (5th ed), § 39, p 255; 23 ALR3d 1083, § 2, pp 1085-1086; 2 Restatement Torts, 2d, § 328D, comment on clause (c) of subsection (1), pp 163-164; *Burghardt v Olson*, 223 Or 155; 354 P2d 871 (1960); *Laster v Tatum*, 206 Va 804; 146 SE2d 231 (1966).

---

[10] The dissent raises a similar argument, stating that a jury could reasonably conclude that the cause of death supported the assertion that "defendants suffocated Mr. Maiden in a manner that evidenced a substantial lack of concern for whether they injured him." *Post* at 140. The dissent's argument is essentially a classic case of the tail wagging the dog. To establish gross negligence as statutorily defined, the plaintiff must focus on the actions of the governmental employee, not on the result of those actions. That death resulted from the restraint does not support the conclusion that defendant's actions were so reckless "as to demonstrate a substantial lack of concern for whether an injury results."

Plaintiff's proofs in opposition to defendants' motion for summary disposition fail to raise a material question that defendant employees' conduct was so reckless as to demonstrate a substantial lack of concern for whether an injury results. Plaintiff failed to meet her burden to come forward with specific facts to support her claim that defendants' conduct was grossly negligent. On the basis of the record before us, reasonable minds could not differ. Accordingly, the trial court properly granted summary disposition for defendants.

### B. *RENO v CHUNG*

Plaintiff submitted affidavits from otolaryngologist Robert Mathog, M.D., and pathologist Laurence Simson, M.D., the Ingham County Medical Examiner, the experts whom the prosecutor had consulted to prepare for plaintiff's criminal trial, in opposition to defendant's motion for summary disposition.

Dr. Simson's affidavit stated in part:

> Dr. Chung's testimony that Robin Reno could not have spoken to Kenneth Reno before she died is incorrect. The basis for her testimony . . . is erroneous and is not consistent with the laryngeal injuries recorded by Dr. Chung. There is no anatomic or physiologic basis for her assertion that Robin Reno would have been unable to speak . . . . Dr. Chung's assertion . . . reflect[s] a misunderstanding on the nature of Robin Reno's laryngeal injuries and/or the mechanisms of laryngeal function in the generation of speech. Since Robin Reno's ability or inability to speak was such an important issue in the case . . . , it would have been prudent for the medical examiner to have sought consultation if she did not have confidence in her own ability to interpret such laryngeal injuries.

Dr. Mathog's affidavit provided:

> Dr. Chung's understanding of the anatomy and physiology of the larynx is flawed and full of misconceptions.
>
> Dr. Chung's testimony that Robin Reno could not have spoken to Kenneth Reno before she died is absolutely wrong.
>
> Her alleged basis for that statement as contained in her testimony . . . is erroneous and has no medical basis.
>
> There is no physiological basis for her assertions. She is anatomically incorrect. She has failed to make a proper examination or gain essential knowledge of the physiology of that area of the body to make findings or testify in regard to same.
>
> Dr. Chung's failure to properly perform the autopsy with the requisite knowledge of the anatomy, physiology and function of the effected area and then testifying to the impossibility of speech based on erroneous assertions regarding the nature of the wounds and their effect on the deceased constituted a breach of her duty to perform her duties as a medical examiner as a reasonably prudent medical examiner would have, and was gross negligence defined as conduct so reckless as to demonstrate a substantial lack of concern for whether an injury was likely to result, resulting in the imprisonment of Mr. Reno based on her testimony.
>
> Defendant Chung failed to possess the requisite knowledge and skill to testify as to the effect of the wounds in the throat area. A reasonably prudent medical examiner would not have testified as she did nor made the baseless findings that she did.

The affidavits of both these expert witnesses reveal more than a mere difference of medical opinion. Rather, both emphatically indicate that defendant had no medical basis for her findings and conclusions. Both expert witnesses essentially opine that defend-

ant's medical findings and testimony were incompetent.[11]

We also note defendant's refusal to cooperate with the prosecutor after he consulted the other expert witnesses. Defendant made her records and specimens available to the prosecutor for the experts' review only after a court order compelled her to do so. A reasonable inference can be drawn that defendant refused to comply because she knew her opinion was fallacious and that her incompetency would be revealed.

Defendant's erroneous conclusion regarding the victim's ability to speak before she died was the key factor leading to plaintiff's arrest. The assistant prosecutor testified in his deposition that defendant's medical opinion was "the most important part of my decision-making process." On these facts, plaintiff's proofs in opposition to the motion for summary disposition thus raised a material question of fact regarding the statutory standard for gross negligence.

IV. DUTY (*RENO v CHUNG*)

The Court of Appeals in this case extended the public duty doctrine of *White v Beasley*, 453 Mich 308; 552 NW2d 1 (1996), to hold that defendant medical examiner owed no duty to and had no special relationship with plaintiff. Because the Legislature

---

[11] Dr. Mathog averred that defendant's performance was grossly negligent as defined by statute. However, the witness did not create a question of fact by merely opining that defendant's performance violated the statutory standard. Whether the statutory standard of care was violated is a legal conclusion. The opinion of an expert does not extend to legal conclusions. *Downie v Kent Products, Inc*, 420 Mich 197, 205; 362 NW2d 605 (1984). The facts in the expert witnesses' affidavits properly created a question of fact.

has implicitly delineated the nature and scope of defendant's duties relative to criminal defendants, we need not determine whether an individual duty exists under the common law or whether the public duty doctrine of *White v Beasley* should be extended to the facts of this case.[12]

The question presented is whether defendant medical examiner owed a duty to plaintiff, a person under investigation for murder, as a consequence of performing an autopsy to ascertain the victim's cause of death and testifying as a state's witness against plaintiff.[13] Whether a duty exists to protect a person from a reasonably foreseeable harm is a question of law for the court. *Murdock v Higgins*, 454 Mich 46, 53; 559 NW2d 639 (1997); *Trager v Thor*, 445 Mich 95, 105; 516 NW2d 69 (1994). "A negligence action may only be maintained if a legal duty exists which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm." *Riddle v McLouth Steel Products Corp*, 440 Mich 85, 96; 485 NW2d 676 (1992).

---

[12] We do not mean to suggest that the statute, *infra*, delineates the scope of the medical examiner's duty in all cases. There may well be instances of misconduct on the part of a medical examiner that are not implicated by the statute. However, such a case is not before us today, and we need not speculate on facts not presented.

[13] The dissent relies on *Lauer v New York City*, 171 Misc 2d 832; 656 NY2d 93 (1997), to support the conclusion that a duty should be imposed on defendant. *Lauer* was modified by the New York Supreme Court, Appellate Division, in *Lauer v City of New York*, 258 AD2d 92; 693 NYS2d 169 (1999). There, the court differentiated the duty of the medical examiner in performing the autopsy from the duty to correct the cause of death on medical records. The appellate court held that the medical examiner had immunity in the performance of the autopsy because "in issuing that diagnosis Dr. Lilavois was exercising his judgment as a Medical Examiner for the benefit of the general public only, and so was shielded by sovereign immunity."

In determining whether the relationship between the parties is sufficient to establish a duty, the proper inquiry is " 'whether the defendant is under any obligation for the benefit of the particular plaintiff. . . .' " *Buczkowski v McKay*, 441 Mich 96, 100; 490 NW2d 330 (1992), quoting *Friedman v Dozorc*, 412 Mich 1, 22; 312 NW2d 585 (1981). This analysis concerns whether the relationship of the parties is of a sort that a legal obligation should be imposed on one for the benefit of another. *Id.*

We need not apply the usual *Buczkowski* common-law analysis, since statutory law provides that defendant owed no legal duty to plaintiff.

### A. A MEDICAL EXAMINER'S STATUTORY OBLIGATIONS

The statutory powers and duties of a county medical examiner are found at MCL 52.201 *et seq.*; MSA 5.953(1) *et seq.* Under our statutory scheme, a county medical examiner must investigate the cause of death in all cases of persons who meet a violent death. MCL 52.202; MSA 5.953(2). Further, a medical examiner "may be required to testify *in behalf of the state* in any matter arising as the result of any investigation required under this act, and *shall testify in behalf of the state* . . . ." MCL 52.212; MSA 5.953(12) (emphasis added). Accordingly, our Legislature has defined a medical examiner's duties. Nothing in the statutory scheme has created duties to a criminal defendant; instead, the duty is owed to the state.[14] Defendant

---

[14] We disagree that we are essentially granting "absolute immunity to any government employee who has statutorily enumerated duties." *Post* at 143. The statute applies only to medical examiners, and the scope of the statutory duty imposed on the medical examiner to the state is completely incompatible with a duty to a criminal defendant. As noted *supra*, n 12,

thus communicated her medical findings to the pros-
ecutor in fulfilling her statutory duty to investigate
cases of violent death and to testify as a state's wit-
ness regarding the results of her investigation. While
an injury to a wrongly accused criminal defendant
from erroneous findings is foreseeable, the express
language of the statute requiring medical examiners
to testify on behalf of the state militates against
imposing any duty on defendant Chung to plaintiff as
a consequence of her incompetent medical findings
and testimony.[15]

### B. WITNESS IMMUNITY

Defendant Chung consulted with the prosecutor
and later testified against plaintiff as the state's fac-
tual and expert witness at plaintiff's preliminary
examination. As such, her role was plainly adversarial
to plaintiff's interests. In *Friedman v Dozorc, supra,*
this Court declined to impose a duty on an attorney
to his client's adversary, stating that to do so would
be "inconsistent with basic precepts of the adversary
system." *Id.* at 23. Moreover, the duty imposed on a
witness is generally owed to the court, not the
adverse party. Accordingly, a breach of the duty owed

---

we do not suggest that the statute grants absolute immunity in every case.
The specific facts of *this* case militate against imposing a duty on defend-
ant medical examiner for the benefit of plaintiff.

[15] The dissent fails "to see the difference" between finding no duty to
plaintiff under the statute and finding no duty under the public duty doc-
trine. *Post* at 142. We reject the dissent's claim that we have merely
adopted the public duty doctrine, a creature of the common law, in
another guise. The dissent essentially ignores the explicit legislative direc-
tive compelling a medical examiner to investigate the cause of death and
to testify as a witness on behalf of the state. The dissent substitutes its
own policy choice for that of the Legislature in finding the duty is owed to
a criminal defendant.

to the court does not give rise to a cause of action in tort by the adverse party.[16]

Further, witnesses who testify during the course of judicial proceedings enjoy quasi-judicial immunity. This immunity is available to those serving in a quasi-judicial adjudicative capacity as well as "those persons other than judges without whom the judicial process could not function." 14 West Group's Michigan Practice, Torts, § 9:393, p 9-131. Witnesses who are an integral part of the judicial process "are wholly immune from liability for the consequences of their testimony or related evaluations." *Id.*, § 9:394, pp 9-131 to 9-132, citing *Martin v Children's Aid Society*, 215 Mich App 88, 96; 544 NW2d 651 (1996). Statements made during the course of judicial proceedings are absolutely privileged, provided they are relevant, material, or pertinent to the issue being tried. See *Martin v Children's Aid Society, supra; Rouch v Enquirer & News of Battle Creek*, 427 Mich 157, 164; 398 NW2d 245 (1986); *Meyer v Hubbell*, 117 Mich App 699, 709; 324 NW2d 139 (1982); *Sanders v Leeson Air Conditioning Corp*, 362 Mich 692, 695; 108 NW2d 761 (1961). Falsity or malice on the part of the witness does not abrogate the privilege. *Sanders, supra.* The privilege should be liberally construed so that participants in judicial proceedings are free to express themselves without fear of retaliation. *Id.* As this Court noted in *Daoud v De Leau*, 455 Mich 181, 202-203; 565 NW2d 639 (1997):

---

[16] See *Lewis v Swenson*, 126 Ariz 561, 566; 617 P2d 69 (Ariz App, 1980); *Kahn v Burman*, 673 F Supp 210, 214 (ED Mich, 1987); *OMI Holdings, Inc v Howell*, 260 Kan 305; 918 P2d 1274 (1996).

> Witness immunity is also grounded in the need of the
> judicial system for testimony from witnesses who, taking
> their oaths, are free of concern that they themselves will be
> targeted by the loser for further litigation. Absent perjury of
> a character requiring action by the prosecuting attorney, the
> testimony of a witness is to be weighed by the factfinder in
> the matter at bar, not by a subsequent jury summoned to
> determine whether the first lawsuit was tainted . . . .

We reject as factually inaccurate plaintiff's claim that witness immunity is unavailable here because the "impact" of defendant's opinion "was not initiated and did not occur in any judicial proceeding . . . ." The autopsy, investigating the circumstances surrounding Robin Reno's death, was performed under statutory mandate and was a necessary predicate to defendant's statutorily compelled testimony. Moreover, defendant's testimony at the preliminary examination regarding the autopsy results led to plaintiff's continued detention. Indeed, scrutiny of the deposition testimony of plaintiff's experts reflects that their opinions hinged on her medical findings and her testimony in court. (See excerpts of Mathog and Simson depositions quoted at pp 128-129, *supra*.) Plaintiff cannot avoid the protection of witness immunity by artful pleading; the gravamen of plaintiff's action is determined by considering the entire claim.

Because defendant owed no legal duty to plaintiff, the gross negligence claim alleged is unenforceable as a matter of law. Summary disposition was properly granted under MCR 2.116(C)(8).

### V. CONCLUSION

In *Maiden v Rozwood*, we reverse the order of the Court of Appeals and affirm the trial court's order

granting summary disposition. In *Reno v Chung*, we affirm the decision of the Court of Appeals.

WEAVER, C.J., and TAYLOR and YOUNG, JJ., concurred with CORRIGAN, J.

KELLY, J. I respectfully dissent from the majority opinion in both *Maiden v Rozwood* (Docket No. 110035) and *Reno v Chung* (Docket No. 107936). In *Maiden*, I would hold that plaintiff has presented sufficient evidence of defendants' gross negligence to survive a motion for summary disposition. In *Reno*, I would hold that defendant owed a duty to plaintiff that supported a cause of action for gross negligence under the governmental immunity statute. MCL 691.1407(2)(c); MSA 3.996(107)(2)(c).

I. *MAIDEN v ROZWOOD*

A

In finding a lack of gross negligence on the part of defendants in this case, the majority erroneously concludes that the statement by defendant Myles was inadmissible hearsay and, therefore, may not be considered by this Court. In addition, the majority needlessly engages in a discussion concerning evidence admissibility under MCR 2.116(G)(4) and whether our court rule henceforth is to be read as mirroring Federal Rule of Civil Procedure 56(e). This Court has not had the benefit of briefing and oral argument regarding whether federal law interpreting Rule 56(e) should be applied to our Rule 2.116(G)(4). Also, the discussion is unnecessary to answer the question actually presented. Hence, it is irrelevant. See *Mudge v Macomb Co*, 458 Mich 87, 105; 580 NW2d 845 (1998);

*Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).

B

Reviewing the evidence in the light most favorable to plaintiff in this case, the facts support her assertion that a jury reasonably could find that defendants' actions constituted gross negligence.

The governmental immunity statute defines gross negligence as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(2)(c); MSA 3.996(107)(2)(c). Here, the evidence supports plaintiff's assertion that defendants held down Mr. Maiden, compressing his airway in such manner that he was unable to breathe for five to ten minutes. While the majority characterizes this as a classic case of "the tail wagging the dog," Mr. Maiden certainly did not, to paraphrase plaintiff's counsel, simply suffocate from choking on a cherry pit. Sometimes, the result of an action provides a characterization of the action itself.

Contrary to the majority's assertion, plaintiff has provided a significant amount of factual support in the record to establish gross negligence on the part of the defendants. In particular, defendants' supervisor testified at his deposition:

> [T]here are no techniques that I demonstrate whereby an individual is placing their weight on a client's head, neck, chest, back, buttocks, legs. It's not—we do not instruct that.

> \*    \*    \*

> [W]hat I train are the techniques which are approved for use, they know that those are the techniques that are

approved for use, and use of any other technique may not
be considered an approved technique.

He also testified that defendants were not taught any
technique that would allow them to put pressure on
the head or neck. None of the methods of restraint
defendants were taught would result in a person not
being able to breathe for an extended period.

There is clear evidence in the record that defend-
ants disregarded their training and used "unapproved"
restraining techniques. For example, in defendant
Rozwood's written statement to the Michigan State
Police, he indicated that he "sprawled myself across
his upper body trying to grab his [right] arm," and
"pushed myself more on to Leith's [left] side of back
hoping my weight would assist in [at] least restricting
his [left] side from twisting." He also admitted putting
"both my hands on the back of his head" and holding
him down for a few seconds. He gave similar testi-
mony at his deposition:

> I put my arm, I believe on his head, to stabilize his head
> so he couldn't move his head anymore to lunge, and then I
> would sit there and continue to talk to him, and that's what
> went on.

*      *      *

*Q.* You just indicated to your neck, when you were show-
ing what area you grabbed, were you holding his neck or
head?

*A.* The back of his head, right over here.

*Q.* Right at the base of his neck?

*A.* At the base, bottom part of his head.

*Q.* And were you holding it hard enough so he could not
move his head?

*A.* For that initial moment, yeah.

Defendant Troy gave similar testimony in his deposition concerning defendant Rozwood's actions:

> *Q.* Was [Rozwood] holding on to his arms or his legs or any other part of his body?
>
> *A.* More than likely—I think he was lying across his—across the side of his back trying to hold his back down onto the floor . . . .

As regards his own actions, defendant Troy testified that he may have lain across the decedent's back at some time:

> *Q.* Did you see anybody laying across Leith's back or neck at any time?
>
> *        *        *
>
> *A.* I might have been laying across his back. I'm not even sure.

In addition, defendant Myles' statement to the police implicated himself in forcefully subduing Leith Maiden along with Paul Troy and Henry Rozwood. The majority incorrectly states that Myles' statement was not admissible under MRE 801(d)(2)(A). This rule requires that, to be admissible, the proffered statement must be offered against a party and be the party's own statement, either in an individual or in a representative capacity. The majority concludes that Myles' statement to the police is not probative of Myles' own negligence and is thus inadmissable to establish defendants' negligence. This is incorrect.

Myles is a named defendant in this joint tortfeasor action by virtue of his direct involvement in the effort to restrain defendant. The evidence in question is directly probative of Myles' negligence and is his own

statement to police. The trial court may be required
to give a limiting instruction to the jury regarding its
use concerning the negligence of the other individual
defendants. However, for purposes of summary dispo-
sition, this evidence is clearly admissible under MRE
801(d)(2)(A).

Hence, as the evidence presented illustrates,
defendants violated their training procedures for sub-
duing a patient, knowing the possible consequences
of restraining a patient improperly. Those facts con-
stitute significant evidence that they were acting with
"a substantial lack of concern for whether an injury
results." MCL 691.1407(2)(c); MSA 3.996(107)(2)(c).

As plaintiff noted, Harrison, Principles of Internal
Medicine (12th ed), also supports her assertion that
the defendants suffocated Mr. Maiden in a manner
that evidenced a substantial lack of concern for
whether they injured him. In discussing the subject of
Anoxic-Ischemic Encephalopathy,[1] the following lan-
guage pertains to the instant case:

> This common and often disastrous condition is caused by
> a lack of oxygen to the brain, resulting from . . . respira-
> tory failure. . . . The conditions that most often lead to
> anoxic-ischemic encephalopathy are . . . (5) suffocation
> (from drowning, strangulation . . . compression of the
> trachea . . . ).
>
> With severe hypoxia or anoxia [loss of oxygen] . . . con-
> sciousness is lost within seconds, but recovery will be com-
> plete if breathing, oxygenation of blood and cardiac action
> are restored within 3 to 5 min. If anoxia persists beyond
> this time, there is serious and permanent injury to the
> brain . . . . [Id., p 2050].[2]

---

[1] A condition caused by lack of oxygen to the brain.

[2] The majority maintains that it would be improper to consider the evi-
dence contained in Harrison in support of plaintiff's argument. I am not

This evidence, combined with the above testimony, indicates a degree of recklessness sufficient to allow a jury to conclude that defendants were grossly negligent, and that their actions evidence a "substantial lack of concern for whether an injury [could] result[]." MCL 691.1407(2)(c); MSA 3.996(107)(2)(c).

The majority emphasizes that the events leading up to the death were relatively chaotic. While this is certainly true, defendants were professionals who were trained to deal with chaotic situations. A jury might ultimately decide that the defendants were, in fact, justified in their actions. However, the question is not for this Court to decide. Rather it is asked only to determine whether there is sufficient evidence in the record to create a question of fact. I believe that plaintiff has produced enough evidence that reasonable minds could differ as to whether these defendants were grossly negligent.

Thus, I would affirm the judgment of the Court of Appeals and hold that plaintiff has presented sufficient evidence of defendants' gross negligence to survive a motion for summary disposition.

---

convinced that a rehearing motion before the trial court should be treated as an appeal when considering the evidence to be weighed in reviewing a summary disposition ruling. Nevertheless, even accepting the correctness of the majority's position, the passages in Harrison are still properly before this Court. The trial court had the opportunity to examine the evidence before it issued the order granting defendants' summary disposition motion. The trial court indicated its preference in entering an order granting summary disposition in favor of defendants during the November 22, 1996, proceedings. However, no order was entered until December 20, 1996. Plaintiff's motion for rehearing, along with an accompanying brief containing the quoted passages from Harrison, was filed with the court on December 10, 1996. Thus, the trial court had an opportunity to review this evidence before issuing the summary disposition order. The evidence is properly before this Court.

II. *RENO v CHUNG*

I agree with the majority that defendant's actions in this case clearly constituted gross negligence. However, I would hold that defendant owed a duty to plaintiff that supports a cause of action for gross negligence under the governmental immunity statute.

The majority maintains that defendant Reno owes no duty to this plaintiff. It bases that conclusion on the fact that she is statutorily required to perform autopsies and to testify in court for the prosecutor and had no "special relationship" with plaintiff. *Ante* at 130. It concludes that "our Legislature has defined a medical examiner's duties. Nothing in the statutory scheme has created duties to a criminal defendant; instead, the duty is owed to the state." *Id.* at 132. The majority takes great pains to point out that this opinion is not to be read as extending the public duty doctrine.

However, the majority's pronouncements are strongly reminiscent of those in the lead opinion in *White v Beasley*,[3] which stated that "[g]overnment employees should enjoy personal protection from tort liability based on their action in conformity with, or failure to conform to, statutes or ordinances not intended to create tort liability." *Id.* at 319.

Indeed, owing a duty to the state or the prosecutor is synonymous with owing a duty to the public-at-large, as the state and prosecutor are representatives of the public. I fail to see the difference between the majority's "traditional" duty analysis and an untoward expansion of the public duty doctrine. The opinion

[3] 453 Mich 308, 357; 552 NW2d 1 (1996).

essentially grants an absolute immunity to any government employee who has statutorily enumerated duties. Indeed, such a restrictive reading of duty goes beyond the public duty doctrine, which at least provides an exception for cases where a "special relationship" exists.

The opinion acknowledges that the statutory provisions outlining the duties of medical examiners do not delineate the examiner's duties in all cases. "There may well be instances of misconduct on the part of a medical examiner that are not implicated by the statute." *Ante* at 131, n 12.

However, the opinion makes no attempt to clarify this statement and explain why the unusual actions by defendant Chung in this case would not constitute such circumstances. Not only did defendant Chung negligently perform the autopsy, she took active steps to cover up her failures when the prosecutor and defense counsel tried to verify her findings. The majority provides no indication that the Legislature intended to protect medical examiners under such circumstances.

The majority opinion misconstrues the nature of plaintiff's claim. He does not allege that the defendant failed to perform her statutory duties; rather, he argues that she performed the autopsy in a grossly negligent manner, and that she tried to hide the evidence of it, afterward. The difference is critical. Defendant owes a duty to the state to autopsy certain decedents. Plaintiff cannot hold her liable for failing to autopsy a certain body. However, once she pulls out the scalpel and makes the first incision, a duty to another may attach depending on how she performs her work.

The facts support the imposition of such a duty here. Determining whether a duty exists in a particular case is a question of law to be decided by the court. *Moning v Alfono*, 400 Mich 425, 436-437; 254 NW2d 759 (1977). In the past, we have considered various factors to decide whether the relationship between the actor and the injured party gives rise to a legal obligation on the actor's part. "In determining whether a duty exists, courts examine a wide variety of factors, including the relationship of the parties and the foreseeability and nature of the risk." *Schultz v Consumers Power Co*, 443 Mich 445, 450; 506 NW2d 175 (1993) (citation omitted). In addition, we have examined the burden on the defendant and the nature of the risk presented. *Murdock v Higgins*, 454 Mich 46, 53; 559 NW2d 639 (1997).

In this case, the factors weigh in favor of finding an enforceable duty. The injury to plaintiff was actually and directly foreseeable to defendant. Before seeking defendant's professional opinion, the prosecutor specifically identified plaintiff and his account of Robin Reno's dying declaration. Under the circumstances, defendant was well aware that her opinion would play a major part in the decision to charge and incarcerate plaintiff. The performance of defendant's duties clearly affected plaintiff in a manner different from the general public.

In addition, the burden on defendant to perform her duties without gross negligence was minimal. Certainly it is to be expected that a medical person employed to accurately determine the medical cause of an unexpected death should be able to accomplish that task.

Moreover, the risk presented by defendant's negligence was serious. This Court does not lightly regard the responsibility of ensuring that innocent persons are not wrongfully incarcerated, even for a short time.

Other states' case law supports a finding of duty here. For example, in *Lauer v New York City*,[4] the court held that the plaintiff had stated valid claims for negligent and intentional infliction of emotional distress. There, a medical examiner failed to properly perform an autopsy and concealed information that caused the plaintiff to be wrongfully suspected in the death of his child. The court stated:

> Defendants' claim that no duty was owed directly to plaintiff is without merit. Even if, as defendants assert, the duty to perform the original autopsy in a responsible manner was owed solely to the public at large as a governmental function, when Lilavois later discovered his error, a duty was owed directly to plaintiff to transmit truthfully the information concerning his son's death, especially in light of his alleged knowledge that plaintiff was suspected of the homicide. [*Id.*][5]

In this case, defendant not only negligently failed to correctly perform the autopsies, she refused to cooperate with the prosecutor when he attempted to substantiate her findings. She forced the prosecutor to obtain a court order to examine forensic evidence,

---

[4] 171 Misc 2d 832, 837; 656 NY2d 93 (1997).

[5] Although the holding in *Lauer v City of New York*, 258 AD2d 92; 693 NYS2d 169 (1999), was later modified, it provides guidance here. Even if the duty to perform an autopsy competently should be differentiated from the duty to correct medical records concerning the cause of death, defendant Chung could still be liable. Not only did she incorrectly perform the autopsy, she deliberately withheld the evidence of her negligence, thus causing defendant to remain wrongfully incarcerated.

causing greater delay in the innocent plaintiff's release from incarceration. The circumstances in this case justify a finding that defendant owed a duty to plaintiff.

I also disagree with the majority's assertion that a finding of liability here will infringe the adversarial process. The majority characterizes the relationship between plaintiff and defendant as adversarial, defendant having sided with the prosecution during her court testimony at plaintiff's preliminary examination. What the majority disregards is that, while defendant ultimately became plaintiff's adversary in court, it was as a direct result of her gross negligence in performing the autopsy.

Moreover, defendant's actions in attempting to cover up her incompetence take this case out of the norm. But for defendant's original incompetence, and her subsequent attempts to hinder a discovery of the facts in the case, plaintiff and defendant would likely never have become adversaries. Holding defendant liable for her gross negligence in this instance would not prevent competent medical examiners from testifying fully. Rather, it would encourage them to take greater care in performing autopsies in the future.

Thus, I would reverse the judgment of the Court of Appeals and remand to the trial court for further proceedings consistent with this opinion.

BRICKLEY and CAVANAGH, JJ., concurred with KELLY, J.