# STATE OF MICHIGAN

# COURT OF APPEALS

STEVEN ILIADES and JANE ILIADES,

      Plaintiffs-Appellants,

v

DIEFFENBACHER NORTH AMERICA INC,

      Defendant-Appellee.

UNPUBLISHED
July 19, 2016

No. 324726
Oakland Circuit Court
LC No. 12-129407-NP

Before: RONAYNE KRAUSE, P.J., and JANSEN and STEPHENS, JJ.

PER CURIAM.

In this products liability action, plaintiff appeals by leave granted the trial court's order granting summary disposition in favor of defendant. Plaintiff was a press operator at Flexible Products, Inc., using a press manufactured by defendant and equipped with a safety device called a "light curtain" that was supposed to halt the machine's operation while anything interrupted a beam of light that traversed the press's opening. Plaintiff was injured when he partially entered the press through that opening and the press automatically cycled, crushing him inside. Summary disposition was granted on the theory that plaintiff's conduct was unforeseeable misuse. We agree with plaintiff that unforeseeable misuse was not an appropriate basis for granting summary disposition on this record. Therefore, we reverse and remand.

Flexible Products is a company that makes parts for car manufacturers, including rubber parts created in multi-hundred-ton molding press machines, of which Flexible Products has many. The specific press involved in the accident that gave rise to this case was Press Number 25, which was purchased from defendant in 1994. The presses operated by injecting rubber from the top, and then the press would "cycle," in which upper and lower plates would come together for a time and then open again, whereupon the finished part would be manually removed by the operator. The presses could be set to run manually, but were generally automatic: they would pause for a time to allow part removal and then cycle again on their own unless halted by a safety device. Press Number 25, as with other presses at that time, was originally equipped with a physical safety door to prevent operators from entering the press while it was operating. Defendant replaced the physical doors with light curtains because customers, including Flexible Products, were "so desperate to kept [sic] the presses in production" that they would bypass the doors, which defendant found "scary."

As noted, light curtains operated by passing a beam of light across the opening to the press. If the light curtain detected an interruption to the beam of light, the press would stop moving. The light curtain was *supposed* to prevent any movement of the press while anything was sticking through the press opening. However, this was not always the case. Plaintiff usually worked on Press Number 1, which had a light curtain he deemed overly sensitive. An operator experienced with Press Number 25, however, reported that there was a gap between the light curtain and the press opening on that press, and someone thin enough could even stand between the light curtain and press opening without interrupting the beam, so the press could cycle. That operator found this out to his surprise, and it was apparently unknown to anyone else.

All press operators at Flexible Products were explicitly trained not to rely exclusively on the light curtains and to wait until the press had stopped on its own before removing parts; the trainers, however, conceded that operators were not supposed to actually turn the presses off except in true emergencies, and as a practical matter, no matter what the employees were trained to do, using the light curtain to halt the presses during part removal was the only practical option. Furthermore, operators were required to maintain certain productivity levels, and notwithstanding their training, many operators would remove parts from presses before the presses came to a complete halt to save time. Some of the presses at the time of the accident had been equipped with buttons that needed to be pushed to resume press operation after a light curtain interruption, but Press Number 25 was not so equipped. Presses were equipped with "parts grabbers" for removing finished products without reaching inside the press, but apparently parts did not always come out neatly or fell out of the molds inside the presses.

As noted, plaintiff was unfamiliar with Press Number 25 and was not working at his usual press because there was something wrong with it. The accident occurred after he returned from a break. He had used the press prior to his break with no issues and had used the parts grabber multiple times. He explained that he started operating the press and it

> probably took a minute or two to recycle, came down, some parts fell out. I
> reached in to grab my parts, grabbed the tool, reached in and grabbed those parts
> and the press started cycling. It never happened before.

Plaintiff stated that his "left foot never left the platform" but his "right knee leaned in so [he] could reach a little bit further." He clarified that his knee was resting on top of the guard or skirting in front of the press itself. He leaned in between the two molds and through the light curtain area. He indicated that he had, in the past, leaned in farther than that, and he had never been told not to do so. He also testified that he had not pressed any button to restart the press. After the press came down on him, he could not move but he was able to attract the attention of the shift foreman by banging a tool against the side. The press eventually needed to be partially disassembled to extricate him.

Defendant moved for summary disposition on the theory that plaintiff knowingly and intentionally bypassed the light curtain safety device and climbed inside the press, contrary to his training, his employer's rules, and his knowledge of how the press could be safely operated. Plaintiff argued in response that defendant mischaracterized exactly what he did and his actions were foreseeable, noting that there was at least a question of fact as to whether operators were supposed to reach inside the press to remove parts and that he might have leaned in too far, but if

so, the light curtains were expressly intended to prevent the kind of accident that occurred. The trial court agreed with defendant that plaintiff had misused the press and done so in a manner that defendant could not reasonably have foreseen.

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, this Court considers all evidence submitted by the parties in the light most favorable to the non-moving party and grants summary disposition only where the evidence fails to establish a genuine issue regarding any material fact. *Id*. at 120. "Whether there was misuse of a product and whether misuse was reasonably foreseeable are legal issues to be resolved by the court." MCL 600.2947(2).

Initially, while we decline to explicitly so decide, we agree with defendant's observation that "misuse" is defined by statute as, in relevant part, "uses contrary to a warning or instruction provided by the manufacturer, seller, or another person possessing knowledge or training regarding the use or maintenance of the product." MCL 600.2945(e). The statute does not appear to dictate any minimal level of egregiousness. Whatever linguistic artistry is employed to characterize his actions, plaintiff's act of partially entering the press in the manner he did appears to have been contrary to instruction provided by his employer. However, as we discuss below, there is at least a genuine question of fact whether he acted within the boundaries of common practice. We therefore decline to decide whether plaintiff did "misuse" the press within the meaning of the statute, but for the purposes of resolving this appeal we do not need to do so. Presuming plaintiff's conduct constituted "misuse," the dispositive issue is whether that conduct was *foreseeable*.

Specifically, the statute at issue is MCL 600.2947(2), which states:

A manufacturer or seller is not liable in a product liability action for harm caused by misuse of a product unless the misuse was reasonably foreseeable. Whether there was misuse of a product and whether misuse was reasonably foreseeable are legal issues to be resolved by the court.

Unfortunately, foreseeability is not defined by statute, and what definitions exist are not helpful: this Court has observed that it is defined as "'the ability to see or know in advance, hence, the reasonable anticipation that harm or injury is a likely result of acts or omissions.'" *Holloway v Martin Oil Service, Inc*, 79 Mich App 475, 478 n 3; 262 NW2d 858 (1977), quoting *Black's Law Dictionary*, 4th ed. Reasonable foreseeability refers to foreseeability by the manufacturer rather than in the abstract. *Antcliff v State Employees Credit Union*, 95 Mich App 224, 230; 290 NW2d 420 (1980), aff'd 414 Mich 624 (1982).

The evidence strongly indicates that *some* manner of reaching into presses was simply how they operated, and consequently *some* risk of injury is indeed foreseeable. The entire point of the light curtains was, indeed, to prevent exactly that. It is well-established in criminal contexts, when evaluating proximate causation, that "[o]rdinary negligence is considered reasonably foreseeable," whereas "'gross negligence' or 'intentional misconduct,'" generally referring to significant disregard for known hazards or consequences, is not. *People v Feezel*,

486 Mich 184, 195-196; 783 NW2d 67 (2010). In the interests of applying a standard beyond picking and choosing analogies, we draw the same distinction here.

We have found no published cases expressly stating whether or not disobeying instructions, warnings, training, or other safety communications *per se* constitutes unforeseeable misuse. However, in the abstract, it is simply common knowledge that users of all kinds of products tend to disregard safety instructions to a greater or lesser degree. Whether or not they *should* is not the pertinent standard; rather, it is whether the manufacturer should *reasonably expect* it. As a general proposition, manufacturers simply cannot reasonably expect that all instructions will always be followed.

Therefore, we examine this case from the more sensible perspective of whether defendant should have reasonably expected that press operators would rely on the light curtains as exclusive safety devices. It is worth noting that there was clear testimony to the effect that the light curtain installed on Press Number 25 did not work properly and would clear even if something was traversing the press opening, a "surprising" fact known to a regular operator of that press, but plaintiff had never worked on that press before. With that one exception, the testimony was uniform that light curtains had never failed. Furthermore, the testimony that light curtains were not "off switches" was somewhat ambiguous given the more or less contemporaneous testimony from the same witnesses that the light curtains did stop the presses and, indeed, that was their purpose. It appears that the reference was that light curtains did not *shut down* the presses.

We appreciate the irony of being the victim of a safety product actually working too well. However, the evidence shows that press operators were routinely in the habit of disregarding their training by relying on the light curtains to remove finished products from the presses as quickly as possible. The evidence at least raises a genuine question of fact whether finished products could be practically removed from the presses without reaching into them. Plaintiff clearly exposed himself to a risk of a much greater *degree* of harm than merely sticking an arm inside. But the *nature* of that conduct was exactly the same: assuming that he would be protected from the press by the light curtain, a safety device that gave every impression of being reliable. Indeed, plaintiff's testimony suggested that for the most part, the light curtains were if anything *too* sensitive. Furthermore, defendant's electrical engineer testified that defendant was actually aware that clients were bypassing the safety doors that preceded the light curtains in the pursuit of continuing operations; it was thus actually aware that its clients incentivized operational efficiency at the cost of safety.

The evidence shows that plaintiff did not *completely* enter the press, the light curtains were supposed to have kept the press from cycling as long as some part of his body was sticking out of the press opening, and whether or not doing so was wise or even formally permitted, it was common practice to rely on the light curtains as sole safety devices. There is no testimony from any of his co-workers that he would have had reason to know that the light curtain on that particular press would be cleared if one got *between* the light curtain and the press, or that such an occurrence was even possible. We do not find, on this record, that plaintiff obviously

-4-

committed gross negligence.[1]  In contrast, defendant knew that its customers might bypass safeties if doing so made press operation more efficient and that parts could not be retrieved from the press without *some* amount of entry thereinto.  It might be reasonably expected that, in light of Flexible Products being one of defendant's biggest customers, defendant would have some familiarity with how the presses were actually used.  It is no great cognitive leap to conclude that defendant should reasonably have anticipated that press operators might reach inside presses and, in so doing, not take the additional time to use any safety features other than the light curtain.  As noted, the statute does not set a standard for egregiousness of misuse, but rather foreseeability.[2]

We conclude that it was reasonably foreseeable to defendant that press operators would, however inadvisably and however contrary to instruction, come to rely entirely on the light curtains for safety.  The trial court therefore should not have granted summary disposition at this time and on this theory.

Reversed and remanded.  We do not retain jurisdiction.

/s/ Amy Ronayne Krause
/s/ Cynthia Diane Stephens

---

[1] We express no opinion, and none should be deemed implied, as to whether plaintiff did or did not commit any kind of negligence.  Furthermore, as noted, we presume that plaintiff misused the press but we likewise do not explicitly decide it.

[2] We understand our dissenting colleague's argument to be that the extent of any misuse affects its fundamental chracter.  We respectfully disagree.