*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

VASILIOS GRIAS,

Plaintiff-Appellant,

v

EQ DETROIT, INC.,

Defendant-Appellee.

UNPUBLISHED
December 17, 2019

No. 344699
Wayne Circuit Court
LC No. 16-012944-NO

Before: BECKERING, P.J., and BORRELLO and M. J. KELLY, JJ.

PER CURIAM.

In this premises liability action, plaintiff appeals by delayed leave granted[1] the trial court's order granting defendant's[2] motion for summary disposition under MCR 2.116(C)(10) and dismissing plaintiff's claims with prejudice. For the reasons set forth in this opinion, we reverse.

## I. BACKGROUND

This appeal arises out of the trial court's order granting defendant summary judgment from an incident at defendant's facility when a descending door that resembled a garage door struck plaintiff in the head. At the time alleged incident, plaintiff was a driver for a trucking company, H&P Transportation. Defendant treats nonhazardous and hazardous industrial waste to stabilize and neutralize it before it is deposited in a landfill.

---

[1] *Grias v EQ Detroit, Inc*, unpublished order of the Court of Appeals, entered December 21, 2018 (Docket No. 344699).

[2] Defendant is also referred to as "US Ecology" in some of the lower court proceedings. However, "EQ Detroit, Inc.," and "US Ecology" are both references to the same entity for purposes of this litigation: there is only one defendant in this case. Additionally, plaintiff refers to defendant at times in his deposition as "EQ."

Plaintiff's job responsibilities at H&P included picking up loads from defendant's facility and delivering those loads to the landfill. After arriving at defendant's facility to pick up a load, plaintiff would check his equipment, get the manifest, and then get his truck loaded. Plaintiff testified in his deposition that he would pick up loads at defendant's facility from one of two doors at the "chemical fixation building." These doors were commonly referred to as the "front door" and the "rail door." The building was approximately an acre in size. The rail door only opened when a pull cord was pulled, while the front door opened automatically when a truck arrived at the door. The rail door pull cord could be reached from inside the cab of a truck by reaching through the window, but it was too high to be reached from the ground. Plaintiff indicated that he never needed to use the pull cord to close the rail door.

Inside the building were six different vats:[3] three were accessible by the front door and three were accessible by the rail door. According to plaintiff, the truck drivers who were ahead of him in line to pick up their loads would direct him to a specific vat at which to load his truck. Based on this information, plaintiff could determine whether to enter the building through the front door or the rail door. Plaintiff would get the manifest inside the chemical fixation building from the person operating the excavator that was to load his truck. The chemical fixation building also had a door called the "back door," which was the door through which the trucks exited after being loaded inside the building.

Plaintiff testified that on the day of the incident, he drove his truck to the rail door, performed his safety checks outside the door, pulled the pull cord to open the rail door, and walked into the building to get the manifest. The excavator was five feet from the doorway, inside the building. Plaintiff was wearing his respirator but was not wearing his hard hat, which was still inside his truck. After obtaining the manifest, plaintiff walked back outside through the rail door, and the door came down and hit him in the back of the head. He did not see or hear the door coming down before he walked back through it. Plaintiff testified, "It hit me in the back of my head and it put me down to my knees." Plaintiff never lost consciousness, but he felt dizzy and disoriented. After the door hit him, plaintiff was able to get up on his own. He walked to his truck, drove it into the chemical fixation building, picked up his load, drove out the back door, and then filed an incident report before leaving defendant's facility. Plaintiff alleged he received injuries to his head, neck, and right arm.

Plaintiff testified that when he would pick up his manifest when loading through the rail door, he would typically walk inside the building rather than drive his truck inside. According to plaintiff, it usually took him less than a minute to get the manifest and the rail door remained up until he walked back outside. After getting the manifest and walking back outside to his truck, he would then drive it into the building for loading. He did not need to pull the pull cord a second time before driving his truck inside. Plaintiff explained that he left his truck outside when getting the manifest because "they load really contaminated stuff" in the chemical fixation building and that when he opened the rail door that day, "it was really smoky." Plaintiff specifically indicated that he made a choice on the day of the incident to walk inside to get the

---

[3] These are also referred to in the record as "vaults" or "pits."

manifest based on the smoky conditions. He testified, "I couldn't see nothing. I didn't want to hurt nobody or run nobody over. So that's why I walked." He also stated, "It was so smoky that I didn't want to proceed with my truck. I didn't want to run nobody over. So the next best thing was walk in." Plaintiff acknowledged that this was his own decision and that nobody had instructed him to walk through the rail door rather than drive his truck inside. Plaintiff further testified that the rail door was the only door available for entry in that area of the building[4] but that there was a "walk-in door" by the front door through which he could enter on foot to pick up his manifest when he loaded at a vat accessible through the front door.

When asked whether he ever drove his truck into the building before getting his manifest, plaintiff responded as follows:

> It depends on the quality of the air that's in the building. If I could see, yes, sure. We'd sometimes do that. It depends. Like I say, because if you load in [vat] 706, [which is near the rail door,] your door still remains open because you have a whole big equipment, you know you have 50 foot [of trailers] sticking out the door. So that door is going to stay open so air does leak out of there. They're not too kindly with that. You know, they don't want that air getting out.

Paul Haratyk, defendant's operations manager, testified that it was uncommon for a driver to get out of the driver's truck and walk through the rail door to get the manifest. Haratyk stated that the drivers "usually just pull right in." David Yurcak, defendant's receiving supervisor, also stated that he did not think people were supposed to walk through the rail door and that pedestrians were supposed to use "man doors." Haratyk acknowledged that it could be "steamy" inside of the chemical fixation building, but drivers "usually beep their horn as they're pulling in [and] the operator [in the excavator] will beep their horn when he likes where he's parked so we can load him." Defendant's maintenance coordinator, Daniel Berry, testified that when the steam was significantly interfering with visibility, the operators would contact the truck drivers outside the building and tell them to wait until the steam cleared before driving it. Berry also indicated that there were "door spotters" to assist with such situations. According to Haratyk, drivers were supposed to pull their trucks entirely into the building and there was sufficient room to do so. A driver could get the manifest from the operator before, during, or after loading.

Haratyk testified that there was a "photo eye" installed on the rail door. The door was a high-speed door that had been installed in approximately June 2015 to replace a "steel roll-up door" that was push-button operated and did not close automatically unless the button was pushed. At some point shortly after the door was installed, the photo eyes had been raised to prevent the door from closing on the trucks. A timer was also installed on the rail door so it would close automatically after a truck drove through. According to Berry, this timer did not

---

[4] It appears that there may also be a pedestrian door near the rail door but that it is always locked, inaccessible to the drivers, and only leads off of defendant's property. There was no evidence that this is currently a functional or usable door.

override the photo-eye. Haratyk and another one of defendant's employees tested the operation of the rail door's safety features after plaintiff's incident. Haratyk "broke the photo eye" while the rail door was descending, and the door reversed direction and went back up. The door automatically went up when he walked through it. He performed this test "three or four" times. Haratyk also testified that the door went back up during his tests when it sensed pressure on the bottom of the door.

With respect to the condition of the air quality inside the building, Haratyk testified that the steam in the building was a normal part of the treatment process that truck drivers would encounter on each arrival and that the amount of steam generated varied from day to day. He also acknowledged that the steam might make it hard for drivers to see. Haratyk stated, however, that in his opinion, the amount of steam in the building on the day of the incident was "[b]etter than normal" and that the air was clear when he checked the operation of the rail door after the incident.

Thomas Green, Jr., a former coworker of plaintiff's, testified that he was a driver for H&P at the time of the incident and that he also picked up loads at defendant's facility during that time. Green explained that when he was directed to the rail door, he would "pull the cord and wait for the smoke to clear and pull in towards the left-hand side" because the excavator would be on the right side near the pits. According to Green, it would take between one and ten minutes for the smoke to clear and there were times where "you cannot see the hood of your truck." Green testified that like plaintiff, he had also left his truck and walked inside to see the operator because of the smoky conditions. Green further stated that "there is occasional whiteouts in there, where you can't see nothing" and he would "[c]ross [his] fingers and hope for the best." Green testified that "you have got hi-lo's zipping around in there" in addition to the excavator.

Randall Sheridan, another driver who had worked at H&P with plaintiff, also testified that there were times when the air was so smoky and foggy inside the building that it was difficult to see while he was driving. He explained that in those situations, "[y]ou just crawl, because you don't want to hit nothing, because there's times when there's hi-los in there, and you just crawl." The smoke and fog in the building was an expected condition that occurred regularly. Sheridan had also walked through the overhead door instead of driving through it, and he had not seen any signs outside the rail door prohibiting pedestrian use. He testified that there had been occasions where he was afraid to drive into the building because of the dense fog:

> [Y]ou don't know what's in front of you. You know, you drive in there and if you can't see the excavator—you can see how wide the place is. There's an excavator sitting in there, and if you can't see that, you know, you can't go in there very fast.

According to Sheridan, the pedestrian entrance by the front door was approximately 2,000 feet around the building from the rail door. Sheridan further explained that it was not possible to walk from the rail door around to this pedestrian door because doing so required going through "a bunch of tanks and stuff there." He stated, "You can't walk through all them tanks and pipes and all kinds of stuff."

In opposing defendant's summary disposition motion in the trial court, plaintiff also attached a report prepared engineer Bradley T. Cook, P.E. Cook visited defendant's facility to perform a site inspection of the rail door, and he described the rail door in pertinent part as follows:

> In addition, there are two photo-electric ('light beam') sensors that project across the opening of the overhead door opening. These sensors are activated when anything physically crosses or obstructs the 'light beam'. The overhead door will either not initiate closing or reverse the overhead door if it is already closing.
>
> There are no sensors to detect and reverse the overhead door closing for an approaching pedestrian.
>
> The subject 'rail' overhead door while closing travels 2.8 feet per second (33.8 inches per second). Using the top of the overhead door opening, the overhead door takes 6.9 seconds to open or close. Once open, the overhead door stayed open for 9.4 seconds before beginning to close. The complete opening and closing cycle was 24.1 seconds.
>
> I also note that the overhead door closing or activation cannot be heard above the ambient noise level present in the area outside the facility.

Cook also noted that the technical manual for the door indicated that a "motion/presence sensor is an optional safeguard for the subject 'rail' overhead door" and that a "motion/presence sensor can be configured to open after detecting an approaching object including personnel and/or reverse a closing overhead door when detecting an approaching object."

Finally, Cook reached five "Preliminary Conclusions":

> 1. [Plaintiff] did not have an alternative entry to the [defendant's] facility adjacent to the subject 'rail' overhead door.
>
> 2. [Plaintiff] would not have been alerted to the closing of the subject 'rail' door by sound or sight unless he was directly looking up toward the rolled-up/open position of the door.
>
> 3. This closing speed is too fast for an approaching pedestrian to trigger the photo-electric eyes as a safeguard to avoid an impact.
>
> 4. The subject 'rail' door as installed is not designed, intended, or provided with the necessary safeguards to be used as a personnel access door.
>
> 5. The installation of the subject 'rail' overhead door did not have safeguards nor administrative controls to protect personnel against caught under or pinch hazards, therefore is in violation of known safety regulations and recommended practices for overhead doors.

As previously stated, the trial court granted defendant's motion for summary disposition under MCR 2.116(C)(10) finding there was no evidence of a defect in the door or that defendant had any notice of a defect in the door. Plaintiff now appeals.

## II. STANDARD OF REVIEW

A trial court's summary disposition ruling is reviewed "de novo to determine if the moving party is entitled to judgment as a matter of law." *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When evaluating a motion for summary disposition under MCR 2.116(C)(10), "a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties in the light most favorable to the party opposing the motion." *Id*. at 120 (citation omitted). "Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Id*.

## III. ANALYSIS

As an initial matter, we clarify that despite plaintiff's argument to the contrary, plaintiff's claim clearly sounds in premises liability. As this Court has explained:

> Courts are not bound by the labels that parties attach to their claims. Indeed, [i]t is well settled that the gravamen of an action is determined by reading the complaint as a whole, and by looking beyond mere procedural labels to determine the exact nature of the claim. Michigan law distinguishes between claims arising from ordinary negligence and claims premised on a condition of the land. In the latter case, liability arises solely from the defendant's duty as an owner, possessor, or occupier of land. If the plaintiff's injury arose from an allegedly dangerous condition on the land, the action sounds in premises liability rather than ordinary negligence; this is true even when the plaintiff alleges that the premises possessor created the condition giving rise to the plaintiff's injury. [*Buhalis v Trinity Continuing Care Servs*, 296 Mich App 685, 691-692; 822 NW2d 254 (2012) (quotation marks and citations omitted; alteration in original).]

In this case, plaintiff claimed that he was injured by the rail door at one of the entrances to the chemical fixation building at defendant's facility after walking through the rail door to obtain his manifest due to the presence of smoke that severely reduced his visibility and made him afraid that he would hit somebody if he drove his truck through the door. Plaintiff thus alleged that a dangerous condition on defendant's property caused his injury, and his claim is therefore one of premises liability rather than ordinary negligence. *Id*.

A plaintiff asserting a premises liability action "must prove the elements of negligence: (1) the defendant owed the plaintiff a duty, (2) the defendant breached that duty, (3) the breach was the proximate cause of the plaintiff's injury, and (4) the plaintiff suffered damages." *Mouzon v Achievable Visions*, 308 Mich App 415, 418; 864 NW2d 606 (2014) (quotation marks and citation omitted). The duty owed by a possessor of land to a visitor depends on whether the

visitor is classified as a trespasser, licensee, or invitee. *Stitt v Holland Abundant Life Fellowship*, 462 Mich 591, 596; 614 NW2d 88 (2000). Plaintiff was on defendant's property in his capacity as a truck driver for H&P to pick up a load of waste for transportation to the landfill. Defendant is a treatment facility that treats nonhazardous and hazardous waste before it is deposited in a landfill. The parties do not appear to dispute that plaintiff was an invitee because he was on defendant's property for a business purpose. "[I]nvitee status is commonly afforded to persons entering upon the property of another for business purposes." *Id*. at 597. "[A]n invitee is entitled to the highest level of protection under premises liability law."

"In general, a premises possessor owes a duty to an invitee to exercise reasonable care to protect the invitee from an unreasonable risk of harm caused by a dangerous condition on the land." *Lugo v Ameritech Corp, Inc*, 464 Mich 512, 516; 629 NW2d 384 (2001), citing *Bertrand v Alan Ford, Inc*, 449 Mich 606, 609; 537 NW2d 185 (1995). This duty generally does not, however, include the removal of dangers that are open and obvious. *Lugo*, 464 Mich at 516. As our Supreme Court explained in *Lugo*, "the open and obvious doctrine should not be viewed as some type of 'exception' to the duty generally owed invitees, but rather as an integral part of the definition of that duty." *Id*. at 516. Nevertheless, "if special aspects of a condition make even an open and obvious risk unreasonably dangerous, the premises possessor has a duty to undertake reasonable precautions to protect invitees from that risk." *Id*. at 517.

In *Bertrand*, our Supreme Court thoroughly explained how to define the scope of the duty owed by a premises possessor when there are "special aspects" of an otherwise ordinary, open and obvious condition:

> The invitor's legal duty is "to exercise reasonable care to protect invitees from an unreasonable risk of harm caused by a dangerous condition of the land" that the landowner knows or should know the invitees will not discover, realize, or protect themselves against. [*Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 499; 418 NW2d 381 (1988)], citing 2 Restatement Torts, 2d, § 343, pp 215–216. Section 343 provided:
>
> > A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
> >
> > (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an *unreasonable* risk of harm to such invitees, and
> >
> > (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
> >
> > (c) fails to exercise reasonable care to protect them against the danger. [Emphasis added.]
>
> A claim that the invitor has breached the duty to exercise reasonable care to protect invitees from unreasonable risks of harm has traditionally been premised on three theories: failure to warn, negligent maintenance, or defective physical

structure. Consequently, invitors may be held liable for an invitee's injuries that result from a failure to warn of a hazardous condition or from the "negligent maintenance of the premises or defects in the physical structure of the building." *Williams*, [429 Mich] at 499–500.

The Restatement provided:

> A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, *unless the possessor should anticipate the harm despite such knowledge or obviousness*. [2 Restatement Torts, 2d, § 343A(1), p 218. Emphasis added.]

The accompanying comments provided that §§ 343 and 343A are to be read together. Where a condition is open and obvious, the scope of the possessor's duty may be limited. While there may be no obligation to warn of a fully obvious condition, the possessor still may have a duty to protect an invitee against foreseeably dangerous conditions. Thus, the open and obvious doctrine does not relieve the invitor of his general duty of reasonable care.

When §§ 343 and 343A are read together, the rule generated is that if the particular activity or condition creates a risk of harm *only* because the invitee does not discover the condition or realize its danger, then the open and obvious doctrine will cut off liability if the invitee should have discovered the condition and realized its danger. On the other hand, if the risk of harm remains unreasonable, despite its obviousness or despite knowledge of it by the invitee, then the circumstances may be such that the invitor is required to undertake reasonable precautions. The issue then becomes the standard of care and is for the jury to decide.

A comment accompanying the Restatement explained:

> There are, however, cases in which the possessor of land can and should anticipate that the dangerous condition will cause physical harm to the invitee notwithstanding its known or obvious danger. *In such cases the possessor is not relieved of the duty of reasonable care which he owes to the invitee for his protection.* This duty may require him to warn the invitee, or to take other reasonable steps to protect him, against the known or obvious condition or activity, if the possessor has reason to expect that the invitee will nevertheless suffer physical harm.
>
> Such reason to expect harm to the visitor from known or obvious dangers may arise, for example, where the possessor has reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious, or will forget what he has discovered, or fail to protect himself against it. Such reason may

also arise where the possessor has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk. In such cases the fact that the danger is known, or is obvious, is important in determining whether the invitee is to be charged with contributory negligence, or assumption of risk. . . . *It is not, however, conclusive in determining the duty of the possessor, or whether he has acted reasonably under the circumstances.* [2 Restatement Torts, 2d, § 343A, comment f, p 220. Emphasis added.]

We recently considered the open and obvious danger doctrine in *Riddle v McLouth Steel Products*, 440 Mich 85; 485 NW2d 676 (1992). . . .

The majority in *Riddle* stated:

[T]he "no duty to warn of open and obvious danger" rule is a defensive doctrine that attacks the duty element that a plaintiff must establish in a prima facie negligence case. A negligence action may only be maintained if a legal duty exists which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm. If the plaintiff is a business invitee, the premises owner has a duty to exercise due care to protect the invitee from dangerous conditions. . . . However, where the dangers are known to the invitee or are so obvious that the invitee might reasonably be expected to discover them, an invitor owes no duty to protect or warn the invitee *unless he should anticipate the harm despite knowledge of it on behalf of the invitee. . . .*

Once a defendant's legal duty is established, the reasonableness of the defendant's conduct under that standard is generally a question for the jury. . . . The jury must decide whether the defendant breached the legal duty owed to the plaintiff, that the defendant's breach was the proximate cause of the plaintiff's injuries, and thus, that the defendant is negligent.

If, for example, the dangerous conditions on the premises are hidden or latent, the premises owner is obliged to warn the invitee of the dangers. Defendant's failure to warn under these circumstances may indicate a breach of the legal duty owed plaintiff. *If the conditions are known or obvious to the invitee, the premises owner may nonetheless be required to exercise reasonable care to protect the invitee from the danger. . . .* What constitutes reasonable care under the circumstances must be determined from the facts of the case. *While the jury may conclude that the duty to exercise due care requires the premises*

*owner to warn of a dangerous condition, there is no absolute duty to warn invitees of known or obvious dangers. . . .*

Thus, even though there may not be an *absolute* obligation to provide a *warning*, this rule does not relieve the invitor from his duty to exercise reasonable care to protect his invitees against known or discoverable dangerous conditions. *Williams*, [429 Mich] at 499, citing 2 Restatement Torts, 2d, § 343, pp 215–216. Duty exists because the relationship between the parties gives rise to a legal obligation. . . . However, overriding public policy may limit the scope of that duty. . . .

With the axiom being that the duty is to protect invitees from *unreasonable* risks of harm, the underlying principle is that even though invitors have a duty to exercise reasonable care in protecting their invitees, they are not absolute insurers of the safety of their invitees. . . . Consequently, because the danger of tripping and falling on a step is generally open and obvious, the failure to warn theory cannot establish liability. *However, there may be special aspects of these particular steps that make the risk of harm unreasonable, and, accordingly, a failure to remedy the dangerous condition may be found to have breached the duty to keep the premises reasonably safe.* [*Bertrand*, 449 Mich at 609-614 (second, fourth, fifth, and sixth alterations in original; first and fifth ellipses in original; final emphasis added).]

The *Bertrand* Court considered the above legal principles in the context of premises liability cases involving steps and further derived the following legal principles:

In summary, because steps are the type of everyday occurrence that people encounter, under most circumstances, a reasonably prudent person will look where he is going, will observe the steps, and will take appropriate care for his own safety. Under ordinary circumstances, the overriding public policy of encouraging people to take reasonable care for their own safety precludes imposing a duty on the possessor of land to make ordinary steps "foolproof." Therefore, the risk of harm is not unreasonable. However, *where there is something unusual about the steps, because of their "character, location, or surrounding conditions," then the duty of the possessor of land to exercise reasonable care remains. If the proofs create a question of fact that the risk of harm was unreasonable, the existence of duty as well as breach become questions for the jury to decide.* If the jury determines that the risk of harm was unreasonable, then the scope of the defendant's duty to exercise reasonable care extended to this particular risk. At any rate, the trial court may appropriately consider the specific allegations of the breach of the duty of reasonable care, such as failure to warn, negligent maintenance, or dangerous construction. If the plaintiff alleges that the defendant failed to warn of the danger, yet no reasonable juror would find that the danger was not open and obvious, then the trial court properly may preclude a failure to warn theory from reaching the jury by granting partial summary judgment. [*Id*. at 616-617 (citation omitted; emphasis added).]

In *Bertrand*, the plaintiff fell backwards off a step near a door located at the defendant's automobile service garage. *Id*. at 621-622. The Court described the scene as follows:

As [the plaintiff] was exiting the door [from the lounge area], other people were entering. The plaintiff walked through the door and was facing backward as she held the door open for the others to enter. The door opened out onto a sidewalk that was the width of the door. The sidewalk was an elevated walkway that ran along the side of the service area. On the left were vending machines. The cashier's window was on the right. The door was hinged on the right and opened out. Pictures of the area reveal that a person leaving the lounge area would have to walk through the narrow passage between the open door and the vending machines, step down off the sidewalk, walk around the door, and then step back up onto the sidewalk to reach the cashier's window. The entire length of the top edge of the sidewalk was painted bright yellow, as well as the vertical part when viewed from the service area. [*Id*. at 622.]

The plaintiff testified at her deposition that after holding the door open for the other people to enter the lounge area, she stepped back to let the door close because she could not step to the side due to the presence of the vending machine, and she fell down the step as she stepped back. *Id*. at 622-623.

The *Bertrand* Court determined that although the plaintiff could not rely on a failure to warn theory because "no reasonable juror would disagree that the danger of falling was open and obvious," the condition could still be considered "unreasonably dangerous[] but not for want of a warning." *Id*. at 623. The Court concluded, "when we view the plaintiff's allegations in the light most favorable to her, we find a genuine issue regarding whether the construction of the step, when considered with the placement of the vending machines and the cashier's window, along with the hinging of the door, created an unreasonable risk of harm, despite the obviousness or the invitee's knowledge of the danger of falling off the step." *Id*. at 624. The Court reasoned as follows:

Here, the plaintiff fell backward off a step after holding the door open for other customers to pass through in an area of the defendant's building where customers were expected to traverse. In the light most favorable to the plaintiff, one can reasonably argue that the defendant should have reasonably anticipated a congested pedestrian traffic pattern causing an invitee to fall off the step.

We cannot find as a matter of law that the risk of harm was reasonable. Because a genuine issue existed regarding whether the defendant breached its duty to protect the plaintiff against an *unreasonable* risk of harm, in spite of the obviousness or of the plaintiff's knowledge of the danger, summary disposition was inappropriate. Whether this risk of harm was unreasonable and whether the defendant breached a duty to exercise reasonable care by failing to remedy the danger are issues for the jury to consider. [*Id*. at 624-625.]

Subsequently, in *Lugo*, 464 Mich at 517-518, our Supreme Court emphasized that in this context, "[c]onsistent with *Bertrand*, . . . the critical question is whether there is evidence that

-11-

creates a genuine issue of material fact regarding whether there are truly 'special aspects' of the open and obvious condition that differentiate the risk from typical open and obvious risks so as to create an unreasonable risk of harm, i.e., whether the 'special aspect' of the condition should prevail in imposing liability upon the defendant or the openness and obviousness of the condition should prevail in barring liability."

Finally, the following statements by the *Lugo* Court are specifically pertinent to the factual circumstances at issue in this case:

> [I]n resolving an issue regarding the open and obvious doctrine, the question is whether the *condition of the premises* at issue was open and obvious and, if so, whether there were special aspects of the situation that nevertheless made it unreasonably dangerous. In a situation where a plaintiff was injured as a result of a risk that was truly outside the open and obvious doctrine and that posed an unreasonable risk of harm, the fact that the plaintiff was also negligent would not bar a cause of action. This is because Michigan follows the rule of comparative negligence. Under comparative negligence, where both the plaintiff and the defendant are culpable of negligence with regard to the plaintiff's injury, this reduces the amount of damages the plaintiff may recover but does not preclude recovery altogether. [*Id*. at 523.]

"Accordingly, it is important for courts in deciding summary disposition motions by premises possessors in 'open and obvious' cases to focus on the objective nature of the condition of the premises at issue, not on the subjective degree of care used by the plaintiff." *Id*. at 523-524.

In this case, it was undisputed that the rail door was the only entry point in that area of the building. It was opened from the outside by pulling a pull cord, and the door was on a timer that caused it to close automatically. There was testimony from plaintiff and two other truck drivers that the conditions inside the chemical fixation building were sometimes smoky to the point that visibility was affected. At times, there could be "whiteouts" that severely reduced visibility to the point that it was even difficult for the driver to see the hood of his truck. Inside the building, there were excavators that loaded waste into the trucks to be hauled away and hi-los "zipping around." All three drivers testified that there were times when they walked through the rail door (rather than driving through it) to avoid these hazards inside the building when there was severely reduced visibility due to the smoky conditions. Plaintiff specifically testified that the conditions were particularly smoky on the day of the incident and that he chose to walk through the rail door that day because he could not see anything and did not want to hit anyone with his truck. Sheridan testified that the pedestrian door, which was located by the front door, was over 2,000 feet away from the rail door and that it was not accessible by walking from the rail door area because doing so would require walking through an area of tanks and pipes that could not be traversed on foot. Plaintiff's expert opined that the rail door's current safety features, combined with the speed at which the door descended, would not protect an approaching pedestrian from impact. Plaintiff's expert also opined that the descending door could not be heard above the noise level of defendant's facility.

There was also testimony from individuals employed by defendant acknowledging that the conditions inside the building could be steamy or smoky to the point of affecting visibility.

There was further testimony indicating that it was "uncommon" for a driver to walk through the rail door to obtain the manifest. However, Haratyk testified that the conditions were less steamy than normal on the day of the incident and that the air was "clear." There was also testimony that people were not supposed to walk through the rail door, although there were no signs prohibiting pedestrian use. Defendant's employees also testified that there was communication between the truck drivers and the excavator operators when conditions were steamy inside the building. According to Haratyk, drivers would beep their horns as they drove in and the operators would respond by beeping their horns when the truck was properly parked. Berry testified that operators would contact truck drivers to tell them to wait for steam to clear before entering and that there were "door spotters" when conditions were especially steamy. Haratyk testified that the rail door's safety features, including its photo-eye that sensed the presence of an obstacle under the door and the door's pressure sensor that would reverse the door if the bottom of the door hit an obstacle, were operating properly when tested shortly after plaintiff reported the incident. Haratyk also testified that the door automatically went back up when he walked through it.

We concur with defendant that as presented, we cannot ascertain a question as to whether plaintiff was aware of the conditions presented by the rail door and the hazards inside the building, and these conditions were therefore open and obvious. See *Hoffner v Lanctoe*, 492 Mich 450, 461; 821 NW2d 88 (2012) ("Whether a danger is open and obvious depends on whether it is reasonable to expect that an average person with ordinary intelligence would have discovered it upon casual inspection."). But that does not end our analysis. Rather, the record reveals the existence of conflicting evidence. This conflicting evidence regarding the nature of the steamy conditions and degree of visibility on the day of the incident, as well as whether the combination of all of the hazards presented at the rail door entrance—a single entrance through a high-speed door that closed automatically pursuant to a timer and had certain safety features that may not have provided adequate protection for approaching pedestrians specifically, the potential for extreme smoke or steam severely reducing visibility while driving large trucks, and the presence of an excavator and hi-los driving around in the vicinity—constituted special aspects from which the trier of fact could conclude made the risk of harm when entering the building through the rail door unreasonable despite the open and obvious nature of the hazards. Hence, viewing the evidence in a light most favorable to plaintiff as the nonmoving party, *Maiden v Rozwood*, 461 Mich at 120, the combination of hazards at the rail door on a day when the treatment process generated extreme smoke or steam would essentially force a truck driver such as plaintiff to choose between the risk of a collision with an excavator or hi-lo while driving through the rail door and the risk of being injured while walking through a door not sufficiently safe for pedestrian traffic. The pedestrian door by the front door did not *actually* provide a legitimate alternate means of entering the building on foot when a driver was to pick up a load at a vat serviced by the rail door because doing so would have forced the driver to confront a whole new set of conditions that were potentially dangerous for pedestrians. Thus, regardless of the proper operation of the rail door, there were genuine issues of material fact with respect to whether entry through the rail door, because of its "character, location, or surrounding conditions," presented a risk of harm that remained unreasonable despite these conditions being open and obvious. *Bertrand*, 449 Mich at 617 (quotation marks and citation omitted).

Further, the record evidence makes clear that it was well known among defendant's employees that the rail door was the only available entry point in that area and that the treatment process frequently generated a great deal of steam. Accordingly, viewing the evidence in a light most favorable to plaintiff, there was a genuine issue of material fact regarding whether defendant should have anticipated that an unreasonable risk of harm remained in navigating the rail door entrance—including that truck drivers might determine that walking through the rail door was the safest possible alternative[5]—and thus taken appropriate additional steps to protect its invitees as a result; we cannot conclude that these conditions were reasonable as a matter of law. *Id*. at 624-625. "If the proofs create a question of fact that the risk of harm was unreasonable, the existence of duty as well as breach become questions for the jury to decide." *Id*. at 617.

In a related vein, a premises liability claim requires a plaintiff "to establish that defendant, as a premises owner, possessed actual or constructive notice of the dangerous condition." *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 10; 890 NW2d 344 (2016). The *Lowrey* Court further explained the legal principles regarding a premises owner's liability based on notice of a dangerous condition:

> "The proprietor is liable for injury resulting from an unsafe condition caused by the active negligence of himself and his employees; and he is liable when the unsafe condition, otherwise caused, is known to the storekeeper or is of such a character or has existed a sufficient length of time that he should have knowledge of it." [*Id*. (citation omitted).]

"The plaintiff, however, bears the burden of proof of establishing that the defendant breached this duty of care, i.e., the defendant knew or should have known 'of a dangerous condition on the premises of which the invitee [was] unaware and fail[ed] to fix the defect, guard against the defect, or warn the invitee of the defect.' " *Id*. at 10 n 2 (citation omitted; alterations in original).

In this case, the evidence discussed above also demonstrates, when viewed in plaintiff's favor, that it could be reasonably inferred that defendant knew about the nature of the conditions surrounding the rail door entry or at least should have discovered the risk of harm presented by these conditions. Defendant's employees were working in that area daily as well, and they knew about how the rail door operated, the degree of steam produced as a normal part of the treatment process, the nature of the operations occurring inside the building as excavators loaded trucks with waste to be hauled away to the landfill, and that the new rail door had been in place for a period of months. Thus, based on the evidence showing the character of the conditions surrounding entry through the rail door that had been regularly encountered by truck drivers, plaintiff presented sufficient evidence to create a genuine question of fact regarding whether defendant had actual or constructive notice of the dangerous condition. *Id*. at 10.

---

[5] See *Bertrand*, 449 Mich at 611-612.

As previously stated, the trial court granted summary disposition in defendant's favor based on the trial court's conclusions (1) that the evidence showed that the rail door and its safety mechanisms were functioning properly on the day of the incident; (2) that there was no evidence of a defect in the door; (3) that there was no evidence showing that defendant was actively negligent in maintaining the rail door; and (4) that even if there had been a defect in the door, plaintiff failed to show that defendant had actual or constructive knowledge of that defect.

Reviewing the trial court's decision, we hold that in the proceedings before the trial court, both the trial court and defendant erroneously focused solely on whether there was a defect in the operation of the rail door itself, rather than considering all of the surrounding circumstances. Such a singular focus was contrary to our Supreme Court's instructions in *Bertrand*, 449 Mich at 617, 622-625. Rather the trial court should have made more general determinations as to whether the entry to the chemical fixation building through the rail door presented a dangerous condition subjecting invitees to an unreasonable risk of harm despite the proper operational functionality of the rail door. *Id*. Such a directive is found in *Bertrand*, 429 Mich at 624, where there was an issue of fact regarding whether "the construction of the step, when considered with the placement of the vending machines and the cashier's window, along with the hinging of the door, created an unreasonable risk of harm, despite the obviousness or the invitee's knowledge of the danger of falling off the step." Similarly, there exist within this record, genuine disputes of fact regarding whether there were special aspects presented by the nature of the rail door entrance and its attendant hazards at defendant's facility that constituted an unreasonable risk of harm despite that defendant's injury was allegedly caused by an impact from the rail door—an otherwise ordinary, open and obvious hazard. Stated differently, focusing solely on the rail door in isolation in this case is analogous to focusing solely on the fact that the plaintiff in *Bertrand* fell on a step, thereby ignoring the surrounding circumstances of the vending machine, the congestion of pedestrians, the direction in which the door opened, the size and location of the step, and the confined space created when the door was open. Accordingly, the analytical focus must encompass all of the surrounding circumstances and here, not merely whether the rail door was operating properly. See *Bertrand*, 449 Mich at 617, 622-625.

We believe it necessary to further note that it is not the proper focus of our inquiry at this stage of the proceedings to determine what extent, if any, plaintiff may have been negligent and contributed to causing his injuries. *Lugo*, 464 Mich at 523-524. "The level of care used by a particular plaintiff is irrelevant to whether the condition created or allowed to continue by a premises possessor is unreasonably dangerous." *Id*. at 522 n 5.[6]

---

[6] We also reject defendant's argument that plaintiff's expert could not provide any relevant evidence in this matter. Contrary to defendant's argument, plaintiff's expert did not opine on the law, the existence of a legal duty owed by defendant to plaintiff, or otherwise opine on whether defendant was negligent. The expert did not attempt to create new legal definitions or standards, nor did he make legal conclusions. "[T]he function of an expert witness is to supply expert testimony. This testimony includes opinion evidence, when a proper foundation is laid, and opinion evidence may embrace ultimate issues of fact." *Carson Fischer Potts & Hyman v Hyman*, 220 Mich App 116, 122; 559 NW2d 54 (1996). Plaintiff's expert offered opinions about

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Jane M. Beckering
/s/ Stephen L. Borrello
/s/ Michael J. Kelly

---

whether the safety mechanisms currently installed on the rail door would prevent an impact with an approaching pedestrian. Such opinions were not improper. *Id*.; see also MRE 704 ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.").